## ASKEW v. THE PEOPLE.

1. PRACTICE IN CRIMINAL CASES—PEOPLES' WITNESSES.

The state may upon the trial of a criminal case call witnesses other than those whose names are indorsed upon the indictment, provided the defendant be furnished with their names in time to prepare his defense.

2. SAME.

When the state gives notice of the calling of new witnesses at the trial of a criminal case, and the defendant desires further time in order to meet their testimony, he must make timely application therefor. And if he desires to obtain a review of the ruling denying such application, the motion and affidavits in its support must be made a part of the record by bill of exceptions.

3. EVIDENCE—EXPERTS—BRANDS.

When by reason of their obscurity a question arises as to the brands on animals alleged to have been stolen, the testimony of experts in deciphering brands is admissible to show what they are.

4. SAME—IMPEACHMENT OF WITNESSES—COLLATERAL FACTS.

A witness is not to be impeached by showing that he has made statements out of court contrary to his testimony at the trial concerning irrelevant matters. A fact drawn out on cross-examination by a party not entitled to prove it as a part of his case is collateral.

*Error to the District Court of Arapahoe County.*

THE plaintiff in error, John Askew, was indicted jointly with Fred Busby, Hedley Eacock and Fred Goldsmith, for the larceny of cattle, of the personal goods, chattels and property of The D. T. Cattle Company, an incorporated company. The defendant secured a separate trial, which resulted in a verdict of guilty, upon which he was sentenced to the penitentiary for a term of two years. To reverse this judgment the cause is brought here by error.

Mr. THOMAS WARD, JR., and Mr. JOHN D. FLEMING, for plaintiff in error.

THE ATTORNEY GENERAL and Mr. CALVIN E. REED, of counsel, for the People.

CHIEF JUSTICE HAYT delivered the opinion of the court.

The evidence for the prosecution discloses that the defendant, Askew, at the time lived about a mile from the town of Watkins, which town is situate about twenty-one miles from the city of Denver, in Arapahoe county. It appears from the evidence that the defendants, Busby and Eacock, drove these cattle into Askew's pasture, by his directions. Carson White, the deputy sheriff who made the arrests, says that after the cattle were driven into the pasture, he examined the brands and earmarks; that there were three steers, one white, which was branded with the D. T. brand, and that the cattle also had the D. T. earmark, which is a crop on the left and one half of a crop on the right ear. The witness says that he afterwards saw two men ride out into the pasture and drive these cattle into a little pen, built around the slaughter house at Askew's place. This was just after daylight. The witness further testifies that he went to the slaughter house again about six or seven o'clock that evening, and saw no cattle there; but seeing a light in the slaughter house about nine o'clock, he approached as near as he could, without being detected, and saw a wagon load of beef and four men near by, whom he recognized as the defendants, Askew, Eacock, Busby and Goldsmith. This was on the 20th inst. He says he saw some of the men get in the wagon and drive away with the beef; that he went and got his horse and overtook the team; found it in charge of Busby, who was driving Askew's team. He arrested Busby and took possession of sixteen quarters of beef, which were in the wagon. The witness says he drove the wagon with the beef to Denver, returning to Watkins the next day, where he observed a man going away from Askew's place on horseback. This man he identified as the defendant, Goldsmith. He says he then drove to Askew's ranch, and found no one there, but saw a team going away, which he overtook, and found it in charge of Askew. He says he caught up with the team three or four miles from the house;

that when he got within a couple of yards of Askew, he (Askew) "threw up his rifle and told me not to come any nearer;" that he told him to drop the gun, as witness had a Winchester; that Askew did so, whereupon he arrested him and took him back to Watkins.

This witness testifies that at the time of making the arrest, Askew was driving as fast as the horses would go, and that at the time of the arrest the defendant said: "We thought you were out here trying to get us, and I was to return the hides to the men I bought them of, with the brands cut out." These hides were found in the wagon which Askew was driving. They were in gunny sacks, and upon examination it was found that the brands were cut out. The witness swears that they were fresh hides, not stiff. Afterwards, Askew told the witness that he had played a joke on him, and that the cattle which he had killed were his own cattle. The witness further testifies that later Askew said they were stolen cattle, driven into the pasture by Busby and Eacock, and he was to pay $10.00 a head as soon as they were knocked down and brands cut out. At the trial the hides were introduced in evidence, the color corresponding substantially with those upon the four animals which the witness saw in Askew's pasture. The brands were entirely cut out from three of the hides, but only partially cut out of the fourth, a part of the brand remaining in this hide. The evidence of other witnesses was introduced equally damaging in character with that of the witness, White.

The defendant admitted the taking and killing of the cattle, but claimed the same as his property, and that of his wife. His explanation of the reason for cutting the brands out of the hides is as follows: That shortly before these animals were slaughtered the defendants, Askew and Eacock, had their attention attracted by a light at night in an old abandoned oil house, situate near Watkins; and approaching the oil house stealthily, and looking into a crack, saw four persons who were talking together—these four persons being Carson White and other witnesses for the state in the trial.

The witness Eacock swears that the man he believed to be White, said : " Well, we have got to do something; got to make a break and do something. It means a big thing for us. There are four gents that ought to be wiped off the earth." The witness says he heard the name of " Big Ea- cock," referring to his son. Heard " Big Jack " mentioned; that Askew was known by that name. He swears that he heard White say: " We have got to have a case, anyhow." This witness further testifies that he heard one of these men say that it would be a smart thing to plant some hides on their places as a means of convicting them of stealing cattle.

We have gone into the testimony sufficiently to show the nature of the case made by the prosecution, as well as to dis- close the nature of the defense, which defense was, that this was a conspiracy on the part of the witnesses for the prose- cution to convict the defendants of cattle stealing in the hope of obtaining a reward for so doing. The defendant testifies that the brands were cut out of the hides and hidden away in the cellar of Kemp's (his father-in-law), in order that he might, in case of trouble, produce the brands and thereby establish his ownership of the cattle, and prove his innocence ; that he was prevented from producing the brands at the trial by reason of some one removing the brands from the house without his knowledge, and that he had not since been able to find them.

The errors relied upon for reversal are discussed by coun- sel under three heads, the first claim advanced being that the ruling of the district court permitting the witnesses, De Lue, H. H. Metcalfe and Carson White, to testify, con- stituted reversible error, because, as it is claimed, no pre- vious notice had been given to the defendant that such witnesses would be called to testify for the people ; the re- fusal of the court to strike out their testimony, and the refusal of the court to grant a continuance at the close of the people's evidence, in order that the defendant might have an opportunity of investigating said witnesses' evi- dence and producing testimony to overcome the same. It

is provided by statute that in all trials for criminal offenses
where the charge is of a higher grade than a misdemeanor,
the accused shall, previous to his arraignment, be furnished
with a copy of the indictment and a list of the jurors and
witnesses. The indictment in this case, which was filed on
March 19, 1895, as it is found in this record, has indorsed
upon it the names of the witnesses whose testimony is ob-
jected to. The defendant was furnished with a copy of
this indictment upon the 23d day of March, 1895. The
indorsement is as follows:

"Conrad White, 2251 Lafayette; * * * Dr. D. C. Morti-
mer; * * * L. DeLue; * * * Carson White; * * * Leo-
nard De Loue."

The record further shows that on the 29th day of April,
1895, the district attorney gave notice to the court and to
the defendant that Dr. D. C. Mortimer, Charles Traut and
L. DeLue were material witnesses for the plaintiff in the
trial of this cause, whereupon it was ordered that the names
of said witnesses be indorsed upon the indictment. Taking
this record together, we think that it shows that the name of
Conrad White, but not Carson White, was indorsed at the
time the indictment was filed; but that the names of Morti-
mer, DeLue and Carson White were subsequently indorsed
pursuant to the order of April 29, 1895.

The trial of the case was not begun until October 28,
1895, on which date, and before trial, counsel for defendant
gave notice that he would object to the witnesses, Mortimer
and White. It is thus clearly shown that the defendant had
notice previous to the trial that these witnesses would be
called. As to the witness, Carson White, it is shown that
this is the same witness indorsed on the indictment origi-
nally as Conrad White, and that his residence, but not his
name, was correctly given in the first instance. With the
exception of the objection stated by the defendant as to the
witnesses, Mortimer and White, before trial, no objection was
made to these witnesses until after they had been called, sworn

and had testified in chief, and upon cross-examination, and in rebuttal. After that time, objection was made to the testimony of these witnesses, and a motion interposed to strike out the same, which was overruled. It is to be observed that the statute provides only that a copy of the indictment, with a list of the witnesses, shall be furnished the accused previous to his arraignment. The witnesses contemplated by the statute are those which have testified before the grand jury, or who were known by the prosecution to be material witnesses at the time of the arraignment. The statute cannot be given such a construction as will confine the state at the trial to the evidence of such witnesses only. It frequently happens that some, or even all, of the witnesses known at the time the indictment was returned, are not to be found at the time of the trial, and the state is, therefore, compelled to call new witnesses or abandon the prosecution. It is well established that the state may, upon the trial, call other witnesses, provided the defendant be furnished with the names of such witnesses in time to prepare his defense. If, when notice of new witnesses is given, the defendant desires further time to enable him to meet the evidence of such witnesses, he must interpose a timely application to the court to secure such time; and in case such application is denied, and a review of such ruling is sought in this court, the motion, with the affidavits filed in support thereof, must be made a part of the record by a bill of exceptions. In this case, neither the motion nor affidavits are so preserved.

Moreover, the defendant must interpose timely objection to the examination of such new witnesses. He cannot wait until the witnesses have been sworn and examined, as this would enable him to speculate upon their evidence, and, if favorable to his defense, allow it to be considered, and if not, be in a position to secure its rejection.

In the case of *Minich v. The People*, 8 Colo. 446, it is said that the " court, in the exercise of a sound discretion, and having a strict and impartial regard for the rights of the community and the prisoner, may permit such witnesses to be

examined as the justice of the case may seem to require." See, also, *State of Kansas v. Cook*, 30 Kan. 82; *Gifford v. The People*, 148 Ill. 173; *Trask v. The People*, 151 Ill. 529.

Moreover, when such evidence has been received, the burden is upon the prisoner to show surprise, and that the evidence of the new witnesses required other and different preparation for his defense. Such showing can only be made in the trial court, and if a review is sought, the proceedings thereon should be incorporated in the bill of exceptions.

The second assignment of error relied upon by counsel is based upon the admission over the defendant's objection of the testimony of the witnesses, Hartman, Shaffer, Sample and Hogan. These witnesses were allowed to testify as experts, and to give their opinion with reference to the brand which was upon one of the hides before the same was cut out. The exact nature of the testimony will be understood when it is remembered that one of the brands was only partially removed, the claim of the state being that in these circumstances the opinions of experts were competent for the purpose of showing that the part of the brands remaining was a part of the D. T. brand of The D. T. Cattle Company, the contention of plaintiff in error being that this related to a matter that does not require any particular experience or peculiar skill; that the jury was as capable of forming a correct judgment as the so-called experts.

We are of the opinion that this evidence was properly admitted. It is well known to all judges of experience in this western country, where animals are branded and turned loose upon the public range, that brands may be accurately deciphered by experts which are unintelligible to those who have not had special skill and experience in observing the same. There are many matters which are properly to be considered in arriving at a correct conclusion as to the identity of a particular brand when it is not plain that are only acquired by experience and observation in the trade or business of handling cattle. Among other things which experienced stockmen take into consideration in deciphering brands may

be mentioned the following: The age of the animal when branded, as the brand enlarges with the growth of the animal; the condition of the branding iron as to the degree to which it is heated when applied to the animal; the length of time of contact of the hot brand with the hide; the age of the animal and the time of the year when the hide is removed, and the state of preservation of the hide at the time of the examination. We are satisfied that these are all matters with reference to which witnesses may become expert and upon which opinions may be given by those qualified as the result of experience and observation. Expert evidence being competent to identify a brand, it certainly was competent to show by experts that the portion of the brand remaining upon the hide was a part of the recorded brand of The D. T. Cattle Company.

The third and last proposition relied upon by counsel to reverse the judgment of the district court is the alleged error in permitting the witness, Gilbertson, in rebuttal to give certain testimony as to a conversation with Fred Busby, one of the defendants, who was called by plaintiff in error as a witness in his behalf.

In order that this ruling of the court may be understood, it is necessary to state briefly the character of the evidence given by Busby when upon the stand at the instance of the defendants. He then testified that he assisted in killing the cattle which were the subject of this charge; that he cut the brands out at Askew's direction; that he was arrested after night with the beef in his wagon while on his way to the city of Denver, with Askew's team and by his direction. The witness testified that the only reason that they had for taking the beef in the nighttime was on account of the wind, which was very bad during the day. He says that he agreed with Askew to kill Askew's cattle, cut the brands out, save them " so that in case of arrest we could put the brands back in the hides, and there would be no case against him (Askew). I was to take charge of the brands so cut out." His testimony in chief goes to show that both he and Askew were

entirely innocent of any criminal intent in the whole trans-
action.

The witness, on cross-examination, said that he knew the
witness, Gilbertson ; that he had entertained him at his house
shortly before his (Askew's) arrest.  " I had heard he had
been a guard at Canon City.  I asked him a number of ques-
tions with reference to the penitentiary."  Thereupon he
was asked by counsel for the state :

" Q. Did you not then say to him (Gilbertson) that you
felt interested in that matter because you were liable to go
there yourself?  A. No, sir.

" Q. Did he ask you the next day how you were making
money, and did you not say you were making money ?  A. I
did not.

" Q. Didn't you say you were butchering ?  A. I did not.

" Q. Didn't you say you were liable to get into trouble on
this account—that you were butchering, and didn't he ask
you how you butchered when you had no cattle, and didn't
you say you bought two or three head once in a while, for a
blind, and then ' rustled ' the cattle ?  A. No, sir, I did
not."

Gilbertson, in rebuttal, was introduced and allowed to
contradict these statements against the objection of the
defendant.  In addition to this, the witness was allowed,
against objection, to testify that the exact language used by
the witness, Busby, at the time and place designated, was :
" We are liable to get into trouble ourselves."  This state-
ment had reference to the defendant and Busby getting into
the penitentiary for stealing cattle.  If Busby had been upon
trial, this evidence might have been competent as against
him ; but it was not admissible against Askew.  The evi-
dence does not fall within the rule allowing a witness to be
impeached by proof that he has made statements out of court
contrary to his testimony at the trial, as this rule is appli-
cable only to matters relevant to the issue.  It is well settled
that upon irrelevant matters a witness cannot be contra-
dicted.

The admission of this evidence is sought to be maintained upon the ground that it goes to the malice or corruption of the witness, Busby; but the malice or corruption which may be shown is malice against the party, or corruption with reference to the attendance of the witness at the trial or to the evidence, neither of which is shown in this instance. Wharton's Law of Evidence, sec. 547; 1 Greenleaf on Evidence, sec. 462; Wharton's Criminal Evidence, sec. 484.

Wharton, in the section last cited, states the general rule as follows: " The test of whether a fact inquired of in cross-examination is collateral, is this: Would the cross-examining party be entitled to prove it as a part of his case, tending to establish his plea? " Clearly, the answer to this question must be in the negative in this case. If the witness, Busby, had, in fact, used the language attributed to him, the state could not introduce such statements as against the defendant, Askew.

In this case, the defendants were jointly indicted, and were allowed separate trials, in obedience to a statute giving defendants jointly indicted for a felony separate trials in case the evidence to be produced is competent against one and inadmissible as to any other of the joint defendants, if tried alone. By the ruling of the district court, the defendant was deprived of the benefit of this statute, and for this error the judgment must be reversed, as the evidence which was erroneously admitted was well calculated to have great weight with the jury, and perhaps, was controlling against the defendant. *Davis v. The People*, 22 Colo. 1.

*Reversed.*