## No. 15,737.

### MONTGOMERY *v.* THE PEOPLE.
(184 P. [2d] 480)

Decided August 18, 1947. Rehearing denied September 8, 1947.

Mr. F. E. DICKERSON, Mr. WILLIAM F. DWYER, Mr. WALTER F. O'BRIEN, JR., for plaintiff in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

MR. JUSTICE ALTER delivered the opinion of the court.

A. H. MONTGOMERY, a licensed chiropractor, was charged in a three-count information with: 1. Administering drugs and using instruments on the body of a pregnant female with intent to procure her miscarriage; 2. unlawful possession of instruments for procuring abor-

tions; 3. unlawful possession of drugs and medicines for procuring abortions. Upon trial to a jury, verdicts of guilty on all three counts were returned. Judgments were pronounced on the verdicts, to review which this cause is brought here by writ of error.

The record discloses that Mrs. Y was a married woman and the mother of two small children. She became pregnant the latter part of June, 1945, while her husband was in Denver on leave from the Navy, and, for reasons sufficient to her, determined upon an abortion.

She communicated with the defendant August 6, 1945, and thereafter many meetings and conferences were had between Mrs. Y and defendant, in all of which the topic of discussion was abortions and how best to accomplish them. As a result, defendant agreed to bring about the abortion. He prescribed drugs for the purpose of producing a miscarriage, which, however, were taken without results. He then definitely arranged to bring about the abortion in defendant's bedroom on August 20, 1945, and he demanded and received from Mrs. Y the sum of $150 for his services in connection therewith. During the meetings and conferences between defendant and Mrs. Y, defendant's actions, conduct, demands and language all indicated a licentious—as distinguished from a professional—attitude. It is unnecessary to here detail defendant's demands made as a consideration for bringing about the abortion; the record stamps him as a moral leper. He was arrested in Mrs. Y's bedroom on August 20, 1945, where were found instruments used in performing abortions, and medicines and drugs which are likewise administered in such cases and which defendant had prescribed.

There are thirty-two assignments of error which defendant has consolidated and discussed under four general heads: 1. Undue limitation of cross-examination; 2. incomplete evidence; 3. instructions erroneously refused and erroneous instructions; 4. insufficiency of the evidence. We shall discuss the assignments in this order.

1. Defendant's counsel assert that Mr. Dickerson, who alone represented defendant below, was unduly restricted in his cross-examination. They cite the cross-examination of Mrs. Y concerning people's exhibits A to E, inclusive, as a specific instance of undue restriction. These exhibits had been identified but not yet offered in evidence at the time of cross-examination. Defendant's counsel desired to cross-examine Mrs. Y with reference to them. Exhibit A was a purse in which was a bottle containing white pills and others in yellow cellophane, both trade-marked "HR." Exhibit B consisted of a dark fluid in a bottle; exhibit C was a metal piece with a rubber hose attached thereto; exhibit D was a grease gun, and exhibit E was a speculum. All of these exhibits were found in Mrs. Y's bedroom and while defendant was there present for the purpose of procuring the abortion. At the time exhibits A to E, inclusive, were identified, defendant's counsel asked that they be offered so as to afford him possession thereof for the purpose of cross-examination. This request was refused, but the trial court assured counsel that when the exhibits were offered in evidence he would have ample opportunity for cross-examination thereon. The exhibits were later offered in evidence, at which time defendant's attorney stated:

"Mr. Dickerson: If your Honor please, there is no identification of the exhibits. Exhibit E is objected to, having no connection with the defendant whatsoever, Dr. A. H. Montgomery, not having been shown to have ever been in his possession at any time. Likewise Exhibit C—no connection whatever with Dr. Montgomery. There is no objection to Exhibit A, this purse. There is no objection to Exhibit B, this phial. There is no objection also as to Exhibit D. There is no evidence showing Dr. Montgomery had anything to do with them at any time.

"The Court: Overruled, admitted."

It is contended by defendant's counsel that Mr. Dicker-

son, by being restricted in his cross-examination as to the exhibits, was prevented from showing that Mrs. Y herself had purchased the noxious drugs. We are unable to agree with counsel that Mr. Dickerson was in anywise prevented from, or restricted in, cross-examination in reference to exhibits A to E, inclusive. The record discloses no proper objection or exception to the admission of the exhibits; no request for further cross-examination of Mrs. Y after the exhibits were offered — in fact defendant's counsel did not avail himself of the opportunity offered him by the trial court for further cross-examination of Mrs. Y when the exhibits were offered in evidence. We perceive no error under the recorded procedure.

██ ██ There are a number of other instances concerning which defendant's counsel contend that the trial court unduly restricted the right of cross-examination; that in each of these the cross-examination was upon matters wholly immaterial to any issue in the case, and, consequently, no error resulted. No objection or exception having been made or saved to the admission in evidence of the exhibits, we are under no obligation to consider and determine error assigned in connection therewith.

██ ██ The right of cross-examination unquestionably is a valuable right, and to deprive one thereof may result in prejudicial error. It is equally true—and all the Colorado decisions support the rule—that one may not attack the credibility of a witness on either direct or cross-examination upon an immaterial matter. *King v. People,* 64 Colo. 398, 172 Pac. 8; *O'Chiato v. People,* 73 Colo. 192, 214 Pac. 404; *Gizewski v. People,* 78 Colo. 123, 239 Pac. 1026. Here, in each instance, the questions propounded by defendant's counsel on cross-examination were upon matters wholly immaterial to any issue in the case, and the trial court committed no error in foreclosing defendant's cross-examination concerning such matters.

No objection or exception having been made or saved to the admission in evidence of the exhibits, we do not consider and determine alleged error assigned in connection therewith. Disregarding any technicality which may preclude a consideration of assigned errors, we hold that the exhibits were properly identified, were clearly admissible in evidence, and that defendant was not unduly restricted in his right of cross-examination pertaining to the same.

 2. Defendant's counsel contend, under the consolidated assignment, "incomplete evidence," that there is no competent testimony concerning the instruments (exhibits C, D and E) nor any competent testimony concerning the drugs (exhibits A and B), and, therefore, that the evidence is insufficient to warrant a conviction on any one of the three counts of the information. It will be remembered that exhibit A was a small purse in which were some drugs, and that exhibit B was a bottle containing some liquid. The contents of exhibits A and B were, according to the undisputed testimony of Mrs. Y, given to her by defendant in connection with, and for the purpose of, producing a miscarriage. Mrs. Y had gone to defendant for the avowed purpose of having an operation to produce an abortion performed. Defendant had agreed to perform the operation upon the payment to him of $150 and Mrs. Y's compliance with other demands. The undisputed testimony is that the contents of exhibits A and B were furnished Mrs. Y by defendant and were taken by her under his directions and upon his assurance that they would accomplish the desired result. This evidence is undisputed.

One of the people's witnesses was a graduate pharmacist, registered in Colorado for eighteen years, and who, at the time of the trial, engaged in pharmacy, and previously had been an investigator in the district attorney's office for fifteen years. He identified exhibits A and B by trade-mark, by superficial examination, and testified to some of the uses and purposes for which

these drugs were adapted. He made no chemical analysis of the contents of exhibits A and B, and it is the contention of counsel for defendant that unless a chemical analysis was made of these exhibits no witness was competent to testify as to their constituents and ingredients. The witness had had years of experience in connection with criminal cases and in handling drugs and medicines, and his opportunity for observation was certainly much greater than that of ordinary individuals. He did not pose as an expert, but he was a witness qualified by practical experience in this particular field, which experience conferred on him special knowledge which was not shared by mankind in general. The witness had testified that exhibit A contained some Hoffman-Roche tablets, among the ingredients of which was barbituric acid, which is a hypnotic analgesic, and there also were some white pills which he identified as Roche's syntropan, which is given to relax the muscles. The identification of the contents of exhibit A was made largely from trade-marks contained on the bottle and the identical likeness with known specimens of drugs of this particular make and kind. The witness identified exhibit B as a liquid containing ergot, viburnum and some ammonia. Exhibit D contained a formula of iodine and formaldehyde, which is used solely for the purpose of packing and producing abortions. Neither allonal nor syntropan could be obtained except on a prescription of a physician or dentist. It is the contention of defendant's counsel that the witness was not qualified to testify either as to the contents, the ingredients of the drugs, or the purpose for which they could be used. It also is their contention that no one could properly testify as to the ingredients of the drugs except one who has made a chemical analysis; and as to the use of the drugs, only a physician or surgeon was qualified to testify respecting them. They rely upon a statement to be found in 32 C.J.S., at page 325, to the effect that a chemist is logically the most competent witness regarding the

constituents of compounds and commends their use as witnesses concerning them; however, we find in the same paragraph the following: "An individual familiar with a particular chemical reaction or physical phenomenon because of long experience therewith may be competent as an expert as to such matters, even though he is not a chemist or physicist." In the present case the witness had had long years of experience in connection with drugs and their use; was familiar with manufacturers' trade-marks, and from trade-magazine articles had become familiar with the constituents and ingredients of drugs and compounds. He was a skilled and experienced, if not an expert, witness, and was qualified to testify to the ingredients of exhibits A and B as well as the use thereof. The question of the weight to be given his testimony was, of course, for the jury's determination. The investigator for the district attorney, as well as the witness pharmacist, were permitted to testify as to exhibits C, D and E. These exhibits were instruments suitable for use in connection with operations to produce abortions. The undisputed testimony is to the effect that defendant was at Mrs. Y's home, in her bedroom, at a specific, appointed time, to perform an operation to bring about an abortion; he came there for that specific purpose, and, when arrested, a search of the bedroom disclosed these exhibits in places accessible to defendant. Mrs. Y, and other witnesses, testified positively that they did not own Exhibits C to E, inclusive, and had never seen them prior to the time they were discovered by the officers in Mrs. Y's bedroom. There is no legal or justifiable basis for the statement that only a surgeon may testify as to the purpose and adaptability of instruments such as those involved in the present case. It requires no knowledge of surgery, no course in anatomy, no special training whatever to enable one to testify as to possible uses for these instruments, and when we consider the evidence in this case, it would tax the credulity of anyone to assume that de-

fendant, who was not permitted to prescribe allonal or syntropan, and yet had done so, and who was not permitted, under the statute, to perform surgical operations, had these instruments in Mrs. Y's room for any purpose other than for procuring an abortion.

Counsel for defendant strongly rely upon our decision in *Stadler v. People,* 59 Colo. 159, 147 Pac. 658, for a reversal. It is contended that we there lay down a definite rule providing that the only proper way to prove the chemical contents and physical properties of compounds such as exhibits A and B, would have been by a qualified chemist who had made a scientific analysis of the drugs. In that case defendant was convicted of selling a compound containing salts of cocaine, and we reversed the conviction. The prosecuting witness, a drug addict, testified that he asked defendant, a prominent physician of years standing, for a dollar's worth of cocaine, and was given a compound which was taken from his possession by the sheriff immediately upon his leaving the doctor's office. The doctor testified that the compound contained chloretone, acetanilide, caffeine and digitaline, but no cocaine. Two doctors—admittedly unfriendly to the defendant—were called to testify concerning the contents of the compound purchased by the drug addict, and having examined it by taste only, each testified that it contained cocaine. Upon cross-examination the attention of both these doctors was called to the following statement by a well-known and recognized medical author: "Cocaine responds to all the general tests for alkaloids, giving precipitates for tannic acid, picric acid, solutions of iodine, etc., but these are not distinctive, nor, unfortunately, do we possess at the present time any one characteristic test for this alkaloid." Neither doctor disputed the correctness of the statement taken from the quoted medical authority, yet the only examination upon which they based their conclusion that the compound contained cocaine was made by taste.

We said in the Stadler case: "There is no contention

that the medical work referred to is not standard authority on the subject, and it will be seen that neither of the witnesses disputes the correctness of the statement of fact therein made. Yet the only test upon which these witnesses based their conclusion that the powder contained cocaine, was by that of taste. * * * Plainly the witnesses were not qualified by the alleged test made, to so testify."

It also is evident that the conviction was reversed because of the incredibility of the prosecuting witness as disclosed by the various contradictory statements set forth in the opinion for we said: "To permit conviction upon a criminal charge, solely upon the testimony of such a witness would be to sanction a mockery of justice."

In the instant case Mrs. Y definitely, and without contradiction, testified that the drugs contained in exhibits A and B were given her by defendant, who told her the purpose thereof and what results could be expected from their use. Her testimony concerning the results which might be expected to follow from the use of the drugs is supported by that of the experienced pharmacist. Exhibits C, D and E were instruments used in connection with abortions, and the evidence justified a finding by the jury that these exhibits belonged to defendant and were to be used by him in procuring an abortion of Mrs. Y. There also was evidence sufficient to warrant the jury in finding defendant guilty under the second and third counts of the information by which he was charged with having in his possession certain instruments and other articles for procuring abortions and having in his possession certain drugs and medicines for procuring abortions.

Mrs. Y further testified that she took medicines and drugs furnished her by defendant for the avowed purpose of procuring an abortion. Some of the medicines and drugs were identified by witnesses as exhibits A and B, and their testimony, coupled with that of the

pharmacist, if believed by the jury, was sufficient to warrant a conviction on the first count of the information which charged defendant with administering poison, noxious and destructive drugs and liquids to be used for the purpose of procuring an abortion.

3. At the conclusion of the people's evidence in chief, counsel for defendant moved for a directed verdict, and the motion being overruled, he called Mrs. Y for further cross-examination, and thereupon rested. Defendant's counsel tendered two instructions in the alternative which, it is said, was defendant's theory of the case, and his only theory. The first reads: "You are instructed if you believe from the evidence that Dr. Montgomery was enticed to the home of * * * for the purpose of making it appear that he was guilty of a crime, or you believe from the evidence that the appearance of or possession of abortion instruments, was fabricated by other persons, you will find the defendant not guilty; and if you entertain a reasonable doubt as to whether or not the evidence and appearances were falsely fabricated against the defendant, it is your duty to find him not guilty." The other tendered instruction, said to be in the alternative, was: "If you find from the evidence that Dr. Montgomery was enticed to the home of * * * for the purpose of entrapping him or falsely putting him in the position of having committed the crime charged, you will find him not guilty; and if you entertain a reasonable doubt as to whether or not the defendant was placed in said position falsely and innocently, it is your duty to acquit him."

The record justifies the statement that while it may have been defendant's theory that he was enticed to the home of Mrs. Y, and it may have been his theory that there was a fabrication of evidence, nevertheless criminal prosecutions are not based upon theories, but upon evidence. There is no evidence in the entire record to support either enticement, entrapment or fabrication,

and, consequently, there was no occasion to instruct the jury thereon.

 Defendant objected to the giving of instruction No. 15, as follows:

"The defendant objects to Instruction No. 15, first, because it is not the law; second, because it is a departure from the information with which the defendant is charged, and third, because it is in advocacy and argument on the part of the court in favor of the prosecution. Next, it does not conform to the proof in this case."

"We object to the argument in the last paragraph. It does not require an instruction; points out to the jury she did not miscarry as a result of what happened in this case, and amounts to a directed verdict of guilty.

"The defendant tendered two instructions, No. 1 and 2, both of which have been refused by the court. They are tendered in the alternative as being the defendant's theory of the case and the only theory. I want the record to show I made an opening statement in this case in which I declared the very theory I have advanced in this instruction. I am not positive whether the reporter took it down or not, but I made this statement in the presence of the court and Mr. Rice and Mr. Anderson, that I did make an opening statement."

It is questionable whether the objection to instruction No. 15 is such as to merit our consideration or a determination as to the propriety to submitting it to the jury. The instruction reads:

"The jury are instructed that the material allegations, as referred to elsewhere in these instructions, as affecting the first count of the information, are that the defendant, A. H. Montgomery in the City and County of Denver and State of Colorado, on or about the 20th day of August, A.D. 1945, did wilfully, knowingly, unlawfully and feloniously:

"1. Administer, or cause to be administered and taken a poisonous or noxious or destructive substance or liquid

or use or cause to be used instruments in and upon the body of * * *, also known as * * *:

"2. That the said defendant A. H. Montgomery did one of the above acts with intent to procure the miscarriage of the said * * *, also known as * * *.

"3. And that at the time the defendant did one of these acts enumerated in paragraph 1, that * * *, also known as * * *, was then and there a woman with child. It is essential that these allegations be established beyond a reasonable doubt to warrant a verdict of guilty on the first count.

"The court further instructs you that it is not necessary for the people to prove that * * *, also known as * * *, miscarried."

We do not perceive any erroneous statement in the instruction, nor has any been called to our attention, and we hold that defendant was not prejudiced by giving it to the jury.

■ If the exhibits were properly identified and admitted, and if the pharmacist witness and investigator for the district attorney were qualified to testify concerning matters about which they were interrogated—and we have held adversely to defendant's contention on both these matters—there can be no question as to the sufficiency of the evidence to support the verdicts and judgments.

4. We have read and carefully considered the entire record in this case and are convinced that defendant had a fair and impartial trial before a court and jury fully conscious of their duties.

Other assigned errors have received our attention and consideration, but we perceive no prejudice to defendant therein.

The judgment is affirmed.

MR. JUSTICE HILLIARD does not participate.