No. 17,230.

HUGGINS *v.* CAMPBELL.
(274 P. [2d] 324)

Decided September 20, 1954.   Rehearing denied October 11, 1954.

Mr. DUANE O. LITTELL, Mr. ROBERT W. MESCH, for plaintiff in error.

Mr. FANCHER SARCHET, Mr. BRYANT O'DONNELL, for defendant in error.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the Court.

PLAINTIFF in error, as petitioner, on September 15, 1952, filed a petition in contributory dependency in the juvenile court in the City and County of Denver, alleging therein that she was an expectant mother, in the third calendar month of pregnancy; and that defendant in error, respondent, was the father of the unborn child, and as such, had failed and refused to provide for the support or care of petitioner and her unborn child as provided by statute. Respondent answered the petition by a ·denial of each and every allegation thereof and requested a trial by jury. Petitioner gave birth to the baby in question, which had been designated in the petition as Douglas Nathaniel Campbell, on February 11, 1953. After what would seem to be an unusual length of

time, and on July 10, 1953, trial was had to a jury, which returned a verdict finding that respondent was not the father of the child involved and not guilty of contributing to its dependency. Petitioner, relying almost entirely on alleged errors in the admission of improper testimony and exhibits, together with prejudicial remarks of counsel for respondent in the opening statement to the jury, now seeks reversal of the judgment based on the verdict of the jury.

Prior to the opening of the trial, at a hearing in chambers, the question of admissibility of acts or relations of petitioner with other men, if any, occurring prior to the period of gestation, was determined by stipulation that respondent would be permitted to show petitioner's relationships with other men only from May 1, 1952. There were two admitted acts of intercourse between petitioner and respondent on July 12 and July 14, 1952, upon which petitioner relied. The record unmistakably shows, from the testimony of two attending physicians, that the birth was premature and of approximately seven months' development. Hospital records and other testimony, convincingly and without dispute, disclose that petitioner entered a hospital in Montana on July 1, 1952, for surgery in the removal of a breast tumor, and it is undisputed that on that date and at the time of the operation, she was menstruating.

Petitioner and respondent, as children, lived in the same neighborhood in Kalispell, Montana; that prior to the winter of 1950 and 1951, their relationship was casual; that during the early part of 1951, they became more interested in each other, until the summer of 1951, when respondent was called for duty in the air force. Considerable correspondence passed between them while he was in the service and until he returned on furlough in July of 1952, during this furlough period they saw each other constantly; the admitted intercourse occurred on the dates hereinbefore mentioned; and respondent left for Denver, Colorado, on July 19, 1952, where he was

stationed. Soon thereafter he began receiving letters from petitioner showing concern over the possibility of being pregnant due to the admitted acts of intercourse with respondent. Finally, as a result of this correspondence and telephone calls, arrangements were made between the two for petitioner to come to Denver, where they might get married. On arriving in Denver, petitioner stayed with respondent at a hotel and sexual relations again followed. Respondent had previously made arrangements for an apartment in a private home where he moved the petitioner. The testimony is conflicting as to whether they cohabited at the apartment. In a few days the attitude of respondent with reference to all arrangements for a marriage seemed to change, which disturbed petitioner to the extent that she attempted to commit suicide. She pressed him for his reasons for not marrying her, and it developed that he changed his mind on account of her previous relations with other men, of which he was well aware by direct information from her sometime previous to his arranging for her trip to Denver for the marriage. The promiscuous relationship with other men, which was known to him, was all prior to July 1, 1952. This conduct was tantamount to a recognition of the paternity of the unborn child. Upon this complete reversal of respondent's attitude in connection therewith, petitioner instituted this proceeding in dependency.

At the opening of the trial counsel for respondent, in addressing the jury, stated that the evidence would show that petitioner, according to a well-laid plan, had lured respondent from his base in Denver and had intercourse with him during the time of his furlough for the purpose of trapping him as a father of the child she was pregnant with at the time, and further stated that respondent wanted to use contraceptives at the time of the intercourse, but petitioner did not want him to; all of which counsel for respondent did not attempt to prove at any stage of the trial, especially the matter of the contracep-

tive. Counsel for petitioner now contend that these remarks, although not objected to at the time, were well calculated to prejudice the jury against petitioner, and we agree with them in saying that it cannot be said that the remarks were harmless.

Following this improper statement to the jury, apparently well known by counsel for respondent that it could not be established, a lengthy jury trial ensued, creating a record of more than one thousand folios of testimony largely injected into the case by counsel for respondent through cross-examination of petitioner and direct examination of respondent concerning sexual relations between petitioner and other men prior to the period of gestation, and prior to the period that had been agreed upon by stipulation before trial, all over the continuous and repeated objections of counsel for petitioner. This testimony was permitted by the court to be in the record on the theory and contention of counsel for respondent that it was proper cross-examination, because of an insignificant statement or two made by petitioner in her direct examination. We see no reason to detail any of the testimony concerning this sordid and distasteful collateral matter and content ourselves with a discussion of the admission of such testimony as to the alleged error in its admission and the prejudicial effect thereof. The one only and true question properly involved in this case is whether or not respondent was the father of the child involved? In such cases it seems to be the time-worn erroneous practice of counsel for respondents to attack the character of the mother and by that means try to open an avenue of escape by a guilty respondent.

There seemed to be little reason for any denial on the part of petitioner about her relations with other men prior to May 1, 1952, because she had precluded herself of such a denial by many letters, now exhibits in the case, in which she openly admits and talks about with some degree of apparent pride; however, all of this

testimony, wrangled from petitioner and anxiously supported by respondent, was immaterial and dealt with a collateral matter, and by such means she could not be impeached or her credibility attacked.

██ ██ It was long ago well settled that in bastardy proceedings, such as this, the only issue is, not whether the petitioner was of previous chaste character, but rather, is the respondent the father of the child? 104 A.L.R. Annotated, 84, 85: "The issue in bastardy prosecutions being the paternity of the child, the character of evidence admissible must bear a definite relationship to the probability of the accused being the father, and within this limitation the general rule has become established that evidence of sexual intercourse between the mother of an illegitimate child and others than the accused about the time of commencement of the period of gestation is admissible upon that issue, while offers of evidence, unlimited as to time, or referring to a time when in the course of nature conception could not have taken place, will be rejected as irrelevant and immaterial."

The guise or pretense under which counsel for respondent was able to obtain the admission of certain exhibits and cross-examine petitioner on the question of her improper relations with other men prior to May 1, 1952, was not only on the privilege claimed of the right of cross-examination, but insisted that such letters and examination were proper in showing respondent's reason for not carrying out the marriage agreement, and contended that such petitioner on direct examination concerning the affair after she arrived in Denver, had responded as follows: "Q. After the telephone conversation he came by late that night? A. Yes, I asked him to give me a good reason for his attitude — why he wasn't going to marry me. He didn't stay that night. We talked."

██ ██ This is the only instance that we find from the record where the collateral issue as to whether or not

reasons were given for not going through with the marriage. That this is a collateral matter there can be no doubt. "The test of whether a fact inquired of in cross-examination is collateral, is this: Would the cross-examining party be entitled to prove it as a part of his case, tending to establish his plea?" *Askew v. People,* 23 Colo. 446, 48 Pac. 524; *Denver City Tramway Co. v. Lomovt,* 53 Colo. 292, 126 Pac. 276. It is fundamental that the impeachment of a witness must be upon a matter material to the issue on trial. *King v. People,* 64 Colo. 398, 172 Pac. 8. All of this occurred after a direct ruling by the court in chambers to the effect that counsel for respondent could ask petitioner questions to lay a foundation for impeachment on cross-examination. A careful search of the record discloses no evidence whatever of relations with other men during the period of gestation, or any act from which such could reasonably be imputed. The letters upon which petitioner was continuously cross-examined were letters that she had written to respondent prior to May 1, 1952, all of which were received prior to the dates of the admitted intercourse between the parties and before the time that arrangements were made for the contemplated marriage. This constant illumination of petitioner's improper relations with other men prior to the period fixed by the stipulation could have no injurious effect on respondent in the minds of the jury, and have no other possible result than that of prejudice against petitioner, and, in this case, we say without hesitation, that this continual and constant barrage against petitioner was prejudicial and was indulged in by counsel for respondent for no other reason. It appears that the trial court realized it was prejudicial, but in face of that, permitted this trial debacle to continue. The court's position is reflected by the following statement made after a discussion in chambers as to the admissibility of the exhibits and cross-examination on this collateral matter:

"The Court: It is admissible because it is part of the

res gestae of her testimony as to their relationship, all of which is material to the issue here because relationship of the parties is material in determining paternity although none of that relationship is collateral except acts of sexual intercourse. It is quite proper. I know it is *prejudicial* but it seems to me it is admissible, * * *."

* * *

"The Court: We have a stipulation that nothing prior to May 1 relating to immorality indulged in will be admitted." Nevertheless, we have a voluminous record made up largely of this improper and prejudicial testimony in face of the court's statement and ruling.

Counsel for respondent states: "This whole trial turned upon the point of the credibility of the witness." ██ ██ It is well stated in *Montgomery v. People*, 117 Colo. 118, 184 P. (2d) 480, as follows: "The right of cross-examination unquestionably is a valuable right, and to deprive one thereof may result in prejudicial error. It is equally true — and all the Colorado decisions support the rule — that one may not attack the credibility of a witness on either direct or cross-examination upon an immaterial matter. (Citing cases). Here, in each instance, the questions propounded by defendant's counsel on cross-examination were upon matters wholly immaterial to any issue in the case, * * *."

It is apparent that it was designed by counsel for respondent to inject all of this sordid, unsavory evidence before the jury in what was, no doubt, a successful attempt to destroy the credibility of petitioner as to all matters material to the issue.

The judgment is reversed and the cause remanded with directions to the trial court to order a new trial to be conducted according to the stipulation made herein and the law as indicated in this opinion.