## No. 26439

### The People of the State of Colorado v. Burnice Allen Crawford

(553 P.2d 827)

Decided September 7, 1976.

John P. Moore, Attorney General, John E. Bush, Deputy, John R. Rodman, Assistant, for plaintiff-appellee.

Ashen and Fogel, William L. Keating, for defendant-appellant.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

Defendant Burnice Crawford was charged with the first-degree murder of Kenneth Baxter, and the jury returned a verdict of guilty on the lesser included offense of voluntary manslaughter, C.R.S. 1963, 40-2-5.[1] We affirm.

Testimony at trial revealed that defendant and decedent were both middle-aged divorced men who jointly rented an apartment. Though generally on friendly terms, they often quarreled and argued, and on several occasions decedent had in anger slapped defendant. Baxter was a taller and stronger man than defendant.

The killing occurred on June 16, 1972. At approximately 6:30 p.m., defendant and a neighbor, Raymond Basford, entered the apartment, having just purchased various food items at a supermarket, which they intended to prepare for dinner. Baxter was in the kitchen when they arrived, and he and defendant became embroiled in an argument over whether

---

[1]Now section 18-3-104(1)(c), C.R.S. 1973, as substantially revised.

defendant had paid Baxter for some vodka. According to defendant's testimony, Baxter called him a liar and slapped him on the side of the face, knocking him against the refrigerator.

Defendant testified further as follows. After, being struck, he feared further abuse; so he locked himself in his bedroom. He then saw his sixteen-gauge shotgun in the corner and decided to "bluff" Baxter rather than let Baxter strike him again. Exiting the bedroom, he saw Baxter coming rapidly toward him in an angry manner, cursing. He begged the latter to stop and instinctively threw up his hand, which held the gun, to shield himself. The weapon discharged, three or four feet from decedent's throat, fatally wounding him. Defendant testified that he had not intended to kill decedent, and did not intentionally pull the trigger. Though in a state of disbelief as to what he had done, he promptly called the police to report the incident.

The neighbor, Basford, who was present during these events but who did not actually witness the shooting, stated that he heard the parties argue, and that defendant had said, "Ken, apologize to me or I'll kill you." According to Basford, decedent thereafter said "Just forget it. * * * We'll talk about it tomorrow. * * *" Perhaps thirty seconds later, he saw defendant, with the gun, run into the living room, followed by Baxter, and then a shot went off. When he hurried into the living room, said Basford, defendant exclaimed, "He was going to hit me."

Defendant denied that he had threatened to kill Baxter. Three witnesses, some of whom were acquainted with both defendant and decedent, testified that Basford's reputation for truth and veracity was bad and that defendant's reputation for being peaceable and nonviolent was good. Defendant's theory of defense was that the shooting was accidental and that the killing was therefore excusable.

## I.

Defendant argues first that his attorney should have been permitted to cross-examine prosecution witness Basford about two prior incidents which tended to show Basford's disposition to make false statements and accusations: (1) a hoax perpetrated by Basford wherein he informed police and the news media that a boa constrictor was loose in the apartment building where he lived; and (2) his groundless accusation that two women living in his apartment were prostitutes. Defendant contends that these specific incidents reflected adversely on Basford's credibility, in that they showed a desire on his part to be the center of attention and a tendency to make false criminal claims. We hold the trial court properly refused to allow this inquiry.

The right of a criminal defendant to confront his accusers includes the right to liberally cross-examine prosecution witnesses. *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347; *People v. Taylor*, 190 Colo. 210, 545 P.2d 703; and, as a general proposition, the cross-

examiner has broad latitude in impeaching the credibility of adverse witnesses, 2 *C. Torcia, Wharton's Criminal Evidence* § 430 (13th ed. 1972). However, such impeachment may not be upon matters wholly irrelevant and immaterial to issues at trial. *Huggins v. Campbell*, 130 Colo. 183, 274 P.2d 324; *Montgomery v. People*, 117 Colo. 118, 184 P.2d 480.

■ The scope and limits of cross-examination are within the sound discretion of the trial court, and, absent an abuse thereof, the rulings of the court will not be disturbed on review. *McCune v. People*, 179 Colo. 262, 499 P.2d 1184; *Simms v. People*, 174 Colo. 85, 482 P.2d 974; *Archina v. People*, 135 Colo. 8, 307 P.2d 1083.

■ From our review of the record, we conclude that the court did not, under the facts of this case, abuse its discretion. The trial judge permitted three character witnesses to testify that Basford's reputation in the community for truth and veracity was bad. Extending the questioning to the two aforementioned specific incidents might inordinately have prejudiced the jury against Basford's character, without shedding light on his credibility as a witness to the events surrounding the killing of Baxter.

## II.

■ Defendant's second argument is that the voluntary manslaughter instruction given the jury was fatally defective in that it failed to state that in order to find the defendant guilty of voluntary manslaughter the jury must find that the killing was not only unlawful but also intentional.

The jury was instructed on all degrees of homicide: first and second-degree murder, voluntary and involuntary manslaughter. These instructions were given in the statutory language, which is ordinarily sufficient. *Jordan v. People*, 161 Colo. 54, 419 P.2d 656, *cert. denied*, 386 U.S. 992, 87 S.Ct. 1308, 18 L.Ed.2d 338; *Cahill v. People*, 111 Colo. 29, 137 P.2d 673. No objection was made to the specific language of these instructions.

Defendant, however, did tender three additional instructions, which were refused by the court, one of which related to the definition of the word "intentionally." This instruction was taken verbatim from the Colorado Criminal Code, section 18-1-501(5), which became applicable only to offenses committed on or after July 1, 1972. Section 18-1-103, C.R.S. 1973. The offense of which defendant was convicted occurred prior to that time.

Prior to July 1, 1972, the voluntary manslaughter statute under which defendant was convicted did not use the words "intentionally" or "intent" and, although one of the distinctions between voluntary and involuntary manslaughter under the statute relates to the intent with which the act is committed, it was not incumbent on the court to inject a definition of the word "intentionally" into the instruction. When all of the instructions as given, relating to the degrees of homicide, are read and considered together as a whole, they clearly set forth the elements of the respective

offenses charged. The language of the voluntary and the involuntary manslaughter instructions clearly indicates that voluntary manslaughter required intent to kill, whereas involuntary manslaughter consisted in "* * * the killing of a human being without any intent to do so * * *." We find no error in the instructions as given, nor in the rejection of the instructions tendered by defendant.

The judgment is affirmed.