**The PEOPLE of the State of Colorado, Plaintiff-Appellee,**

v.

**Joan Francise FITE, Defendant-Appellant.**

**No. 79SA553.**

Supreme Court of Colorado.

April 27, 1981.

J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., R. Michael Mullins, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Duthie & Tate, Harry G. Tate, Durango, for defendant-appellant.

QUINN, Justice.

The defendant, Joan Fite, appeals her conviction for murder in the second degree. She asserts various grounds for reversal including the claimed unconstitutionality of

the second degree murder statute, section 18–3–103(2), C.R.S. 1973 (1978 Repl.Vol.8), the sufficiency of the prosecution's evidence to support the conviction, and various evidentiary rulings made by the court during the trial. We affirm the conviction.

The defendant was charged by direct information with murder in the first degree after deliberation.[1] The charge arose out of the shooting death of Thomas Fite, her husband, in the early morning hours of December 26, 1978, in their trailer home located approximately 11 miles west of Pagosa Springs. The prosecution's evidence established that on December 25, the evening before the shooting, the defendant and her husband, along with the defendant's daughter, Denise, and other guests, were drinking and playing cards at the Fite home. During the game the victim brandished a hand gun, joking that the game was going to be fair. He then placed the holstered gun on the buffet. Later, during the game, the defendant removed the gun from the buffet and placed it in the drawer of the bedroom night stand. The game eventually was terminated and close to midnight the defendant and the victim retired to their bedroom. Both were intoxicated and their relationship was very tense. They frequently argued, especially when drinking, and apparently were contemplating a divorce.

Denise, who was in an adjoining bedroom, was able to hear what took place when the shooting occurred. She heard the victim ask the defendant to have sex with him, to which the defendant responded, "When you start treating me like a human being, maybe I will let you." The victim called the defendant "a goddamned bitch" and struck her. After a sarcastic remark by the defendant, the victim hit her again. Shortly thereafter two shots were fired and the defendant came to Denise's bedroom and stated "I just shot Tom twice." Denise called the police and requested an ambulance. During the next several minutes the defendant told Denise about having warned her husband several times that she would shoot him if he ever hit her again.

The victim eventually was taken by ambulance to a hospital in Durango. There emergency surgery was performed in an effort to repair extensive damage from two gunshot wounds in his abdomen and chest.

The wounds included major damage to the victim's liver, stomach and pancreas. After surgery he was under intensive care for several days and treated with antibiotics. Clinically the victim appeared to improve remarkably. His attending physician, a general surgeon, discontinued antibiotic treatment in order to avoid the risk of toxic damage to other vital organs. Unknown to the physician, a liver abscess had been developing and on January 17, when the victim was scheduled for discharge, the abscess burst and infiltrated his entire system. The abscess was surgically drained and antibiotic therapy was resumed. However, the victim expired on January 30, 1979, from massive infection and multiple organ system failure secondary to the gunshot wounds.

Shortly after the shooting and before the victim had been taken to the hospital, Officer Ernest Rivas of the Pagosa Springs Police Department and the Archuleta County Sheriff, Dale Smith, arrived at the Fite home. Rivas asked the defendant for the gun and she spontaneously stated that she had warned her husband not to hit her anymore or she would kill him. The defendant had made similar statements to several persons during the six months preceding the shooting.

Officer Rivas and Sheriff Smith made various observations at the scene and seized several objects as evidence, the admissibility of which was questioned at trial. Rivas located the gun wrapped in a towel and locked it in the trunk of his car. Smith discovered on the bed near the victim an expended bullet slug on which he placed the date and his initials. He also observed that the mattress was encased in a sewn cover stained with blood. Photographs depicting the scene were taken. At approximately 4:00 a. m. Rivas delivered the gun, wrapped

---

1. Section 18–3–102(1)(a), C.R.S. 1973 (1978 Repl.Vol. 8).

in the towel, to the sheriff's office. Upon unwrapping the towel Sheriff Smith observed the gun, a .38 caliber revolver, and a holster. He removed two empty shell casings and three loaded shells from the cylinder and dated and initialed each piece of evidence.

On January 26, 1979, Smith obtained a search warrant for the search of the Fite home. During the search he removed the mattress cover and noticed what appeared to be blood stains on the mattress. Examination of a hole in the mattress revealed an expended bullet slug lodged inside. Photographs of the bed, mattress, hole and slug were taken and the mattress was seized as evidence. In January 1979 the sheriff sent several items of evidence by registered mail to the Colorado Bureau of Investigation (CBI) for examination and testing. The first mailing consisted of the .38 caliber revolver, the bullet slug recovered from the bed on December 26, 1978, and the shell casings and bullets which he had removed from the gun upon its delivery to him by Officer Rivas. A separate mailing was made to the CBI of the bullet slug found inside the mattress during the search on January 26.

The preceding recapitulation provides the factual setting for the rulings during the trial challenged by the defendant. Outside the presence of the jury the court conducted a hearing on the admissibility of the mattress. The defendant objected to its admission, claiming that it was not in the same condition as on the evening of the shooting. The court overruled the defendant's objection. With the jury present the prosecution then elicited brief foundation testimony from Sheriff Smith about the mattress and offered it into evidence. Defense counsel conducted a voir dire examination on the exhibit and the trial court ruled the mattress inadmissible. The prosecution also elicited testimony from the sheriff that he observed what appeared to be blood stains on the mattress during his

search of the defendant's home on January 26, 1979. The court admitted, without objection, the photographs of the bed and mattress taken on the evening of the shooting and also, over the defendant's objection, those taken later on January 26. Claiming an inadequate foundation as to the chain of possession, the defendant objected to the admission of the gun (exhibit 25), the holster (exhibit 26), the empty shell casings and loaded shells recovered from the gun (exhibit 29), and the bullet slug (exhibit 28) found inside the mattress on January 26.[2] The court admitted each exhibit and then permitted Ted Ritter, a firearms identification specialist for the CBI, to testify that in his opinion the two bullet slugs recovered from the bed and mattress had been fired by the .38 caliber revolver.

At the conclusion of the prosecution's case the defendant moved for a judgment of acquittal, arguing the insufficiency of the prosecution's evidence on culpability and causation. She also moved to dismiss the lesser offense of second degree murder for the reason that the statutory exclusion in section 18–3–103(2) of impaired mental condition and self-induced intoxication as defenses to second degree murder violates due process of law. The court denied both motions.

The defendant then elected to testify on her own behalf, denied any recollection of the shooting, and stated her last memory of the evening was that of being struck by her husband. Her principal witness was a psychiatrist who testified that she was suffering from an explosive personality and a seizure disorder which rendered the shooting an automatic response beyond her control. In the psychiatrist's opinion the defendant did not deliberate before the killing, lacked an intent to cause death, and did not know what she was doing when she shot her husband.

The trial court submitted to the jury the charge of first degree murder after deliberation and the lesser offenses of second de-

**2.** The defendant did not object to the admission of the bullet slug discovered on the bed by Sheriff Smith on the evening of the shooting

and she does not claim its admission as error on this appeal.

gree murder, manslaughter upon sudden heat of passion,[3] and criminally negligent homicide.[4] The court gave the following instruction to the jury on the affirmative defense of impaired mental condition:

> "It is an affirmative defense to the crimes of murder in the first degree, murder in the second degree, manslaughter, and criminally negligent homicide that the defendant, due to an impaired mental condition, did not have the capacity to form the culpable mental state required by the offense."[5]

The jury was also instructed that if the death of the victim was caused by an independent supervening cause, unforeseen by the defendant and in which she did not participate, then the defendant would not be criminally responsible for the homicide.[6] The jury returned a verdict of guilty to murder in the second degree, resulting in a sentence to a term of ten to twenty years.

We address first the defendant's constitutional challenge to section 18–3–103(2), next her claim on the insufficiency of evidence to support her conviction, and lastly the evidentiary issues.

### I. The Constitutionality of Section 18–3–103(2)

■ Section 18–3–103(2) provides that "[d]iminished responsibility due to lack of mental capacity or self induced intoxication is not a defense to murder in the second degree." The defendant argues that the statutory exclusion of these defenses violates due process of law because it deprives a criminal defendant of the right to contest the culpability elements of second degree murder and thereby lessens the prosecution's burden of proving guilt beyond a reasonable doubt.

In *People v. Gallegos*, Colo., 628 P.2d 999 (1981), we answered part of this argument by holding that section 18–3–103(2) does not impair an accused's constitutional right to prosecutorial proof of guilt beyond a reasonable doubt:

> "This statutory elimination of the affirmative defense of impaired mental condition in prosecutions for general intent crimes does not erode the constitutional requirement of proof beyond a reasonable doubt. Recently, in *People v. Ledman*, Colo., 622 P.2d 534 (1981), we held that section 18–1–803 neither creates a presumption of culpability for general intent crimes, nor derogates an accused's due process right to prosecutorial proof of guilt beyond a reasonable doubt. By a parity of reasoning, it follows that section 18–3–103(2) does not lessen the prosecution's constitutional burden to prove the requisite culpability of 'knowingly' for a second degree murder."

We recognized in *Gallegos* that an issue separate and distinct from that relating to the constitutional burden of proof is whether section 18–3–103(2) prohibits an accused from offering evidence of mental impairment for the purpose of contesting the culpability element of "knowingly" in a prosecution for second degree murder. We there declined to address this issue because the trial record demonstrated that section 18–3–103(2) was not applied against the defendant in a manner injurious to his defense. *See also People v. Ledman, supra.*

The trial court here admitted evidence of the defendant's mental condition in connection with the culpability elements of all

---

3. Section 18–3–104(1)(c), C.R.S. 1973 (1978 Repl.Vol. 8).

4. The type of criminally negligent homicide submitted to the jury was knowingly causing the death of another in the good faith but unreasonable belief that one or more grounds for self defense exists. Section 18–3–105(1)(b), C.R.S. 1973 (1978 Repl.Vol. 8).

5. The jury was also instructed on self defense or justification as an affirmative defense, section 18–1–704, C.R.S. 1973 (1978 Repl.Vol. 8),

and on voluntary intoxication. The defendant does not question those instructions on this appeal.

6. The issue of supervening cause was submitted to the jury as an affirmative defense to all charges, thereby requiring the prosecution to prove the guilt of the defendant as to that issue as well as all other elements of any crime considered by the jury. *See* section 18–1–407(2), C.R.S. 1973 (1978 Repl.Vol. 8).

offenses ultimately submitted to the jury, including second degree murder. Furthermore, the trial court in this case, in spite of the statutory limitations of section 18–3–103(2), instructed the jury that the affirmative defense of impaired mental condition applied to the crime of second degree murder.

Similarly, the trial court instructed the jury that evidence of self induced intoxication "is not a defense to a criminal charge except as it bears upon the culpable mental state as defined in these instructions." In *People v. Del Guidice*, Colo., 606 P.2d 840 (1979), we held that section 18–3–103(2) prohibits the admission of evidence of voluntary intoxication for the purpose of contesting the general intent required for second degree murder. Here the instruction on voluntary intoxication gave the defendant the benefit of an affirmative defense to which she was not entitled.

Section 18–3–103(2) never having been invoked or employed in a manner that prohibited or abridged the defendant's presentation of evidence in defense of second degree murder, she is not in a position to claim the injurious effect of the statute on her defense to that crime.

## II. *The Sufficiency of Evidence*

Next the defendant alleges as error the insufficiency of evidence on the element of deliberation, a necessary ingredient of first degree murder, and the insufficiency of evidence on the specific intent to kill, the requisite culpability for first degree murder and manslaughter.[7] The defendant also claims the evidence on cause of death was legally insufficient to submit the crime of second degree murder to the jury.[8]

In view of the jury's implicit acquittal of the defendant for first degree murder, no purpose would be served by addressing the claimed insufficiency of evidence for that offense. *See People v. Webb*, 189 Colo. 400, 542 P.2d 77 (1975); *People v. Olona*, 180

Colo. 299, 505 P.2d 372 (1973); *Luna v. People*, 161 Colo. 330, 421 P.2d 459 (1966). Likewise, there being no guilty verdict returned on the lesser offense of manslaughter, we decline to address the defendant's argument on that offense.

Reduced to plain terms the defendant's argument on causation is that the discontinuation of antibiotic therapy from January 12 to January 17, when the liver abscess became apparent, constituted gross negligence and a supervening cause as a matter of law, thereby relieving the defendant of criminal responsibility. We do not agree.

A conviction for criminal homicide requires proof beyond a reasonable doubt that death was a natural and probable consequence of the defendant's unlawful act. *Hamrick v. People*, Colo., 624 P.2d 1320 (1981). Generally, the unlawful infliction of a wound which thereafter develops into a fatal infection renders the offender criminally responsible for the consequential death. 1 R. Anderson, *Wharton's Criminal Law and Procedure* § 202 at 451 (12th ed. 1957). However, in *People v. Calvaresi*, 188 Colo. 277, 534 P.2d 316 (1975), we recognized that independent intervening acts or events not attributable to the accused might under certain circumstances relieve a defendant of criminal responsibility for the ensuing death of the victim. We there adopted what we termed "Wharton's rule" on intervening cause:

"To warrant a conviction for homicide, the death must be the natural and probable consequence of the unlawful act, and not the result of an independent intervening cause in which the accused does not participate, and which he could not foresee. If it appears that the act of the accused was not the proximate cause of the death for which he is being prosecuted, but that another cause intervened, with which he was in no way connected, and but for which death would not have

---

7. Subsequent to the trial of this case the culpability for manslaughter under heat of passion was changed from "intentionally" to "knowingly". Section 18–3–104(1)(c), C.R.S. 1973 (1980 Supp.).

8. The defendant makes no claim that the culpability element of "knowingly" for second degree murder was not sufficiently established.

occurred, such supervening cause is a defense to the charge of homicide." 188 Colo. at 283, 534 P.2d at 319, quoting 1 *R. Anderson, Wharton's Criminal Law and Procedure, supra,* § 200 at 448.

*Calvaresi* emphasized that mere negligence on the part of an attending physician does not amount to a supervening cause. Gross negligence, however, not being reasonably foreseeable, does constitute a defense under those circumstances where, but for the gross negligence, death would not have resulted. *People v. Calvaresi, supra* at 283, 534 P.2d at 319; *see* Annot., *Homicide: Liability Where Death Immediately Results From Treatment or Mistreatment of Injury Inflicted by Defendant,* 100 A.L.R.2d 769, 787, § 7 (1965).

The defendant postulates her causation argument on the general surgeon's discontinuation of antibiotic therapy on January 12 in spite of a somewhat elevated white blood cell count from January 12 to January 17, when the liver abscess burst. She claims the white blood cell count clearly indicated the presence of an infection which went untreated. The defendant's argument, however, is refuted by the trial record.

The general surgeon, who was the attending physician, testified that the victim's white blood cell count, although elevated throughout his hospitalization, was generally consistent with the decrease in bone marrow function due to the administration of antibiotics, and also was consistent with the blood loss and trauma caused by the wounds and the surgical repair on December 26. Laboratory tests prior to January 17 were unremarkable because the infection was self contained in the abscess. It was only after the liver abscess burst that the white blood cell count indicated the presence of serious infection. Prior to that incident, however, the victim's clinical signs indicated a steady improvement in his condition.

■ Viewing the evidence in a light most favorable to the defendant and drawing all reasonable inferences therefrom, there is simply no evidence raising an issue of supervening cause on the basis of gross negligence. *A fortiori,* there is no merit in the defendant's argument that the evidence on causation was insufficient, as a matter of law, to submit the charge of second degree murder to the jury. *See, e. g., People v. Bennett,* 183 Colo. 125, 515 P.2d 466 (1973). The trial court's instruction on supervening cause should not have been given and the error in that respect inured to the benefit of the defendant.

### III. *Evidentiary Issues*

The defendant's assertions of error on evidentiary rulings relate to the jury's viewing of the mattress; the testimony of Sheriff Smith about the appearance of blood stains on the mattress; the admission of photographs taken at the Fite home; the chain of custody preliminary to the admission of the gun, the holster, the empty shell casings and the loaded shells removed from the gun; and Agent Ritter's testimony about his examination and testing of the gun and bullet slugs. We find no merit in these claims.

### A.

■ The defendant contends because the mattress was ultimately ruled inadmissible, prejudicial error occurred when the prosecution exposed the mattress to the jury's view while laying a foundation for its admission. The mattress was in the jury's view for only a brief period during the foundation testimony. The jury was expressly instructed not to consider any evidence offered at the trial and rejected by the court. We properly may assume the jury followed this admonition.

■ Moreover, the record here demonstrates that the mattress was adequately identified by Sheriff Smith as the same mattress observed by him on December 26. Although the sheriff could not positively identify the stains on the mattress as the same blood stains observed by him on the night of the shooting, the mattress itself was sufficiently connected with the crime to justify its admission. *E. g., Reynolds v.*

*People,* 172 Colo. 137, 471 P.2d 417 (1970); *Lira v. People,* 166 Colo. 498, 445 P.2d 62 (1968); *Pooley v. People,* 164 Colo. 484, 436 P.2d 118 (1968); *Washington v. People,* 158 Colo. 115, 405 P.2d 735 (1965). The trial court implicitly acknowledged this connection by admitting the photographs of the mattress taken on January 26, 1979. There was no significant change in the condition of the mattress from its seizure on January 26 to the trial.[9] Any error in excluding the mattress, therefore, worked to the defendant's advantage and cannot be claimed as prejudicial.

### B.

██ We next address Sheriff Smith's testimony about his observations of what appeared to be blood stains on the mattress on January 26, 1979. The defendant claims this testimony was inflammatory and prejudicial.

In the course of laying a foundation for photographs of the mattress taken by the sheriff on January 26, 1979, the prosecution asked him how he knew the mattress depicted in the photographs was the same mattress previously observed by him on December 26, 1978. The witness replied, without objection by the defendant, that "upon turning the mattress over, I located what appeared to be blood stains on [it]." Our review of the record discloses that even with an objection, the challenged testimony was properly admitted. Having previously observed blood on the mattress on December 26, shortly after the shooting, the witness merely described his perception on January 26 in terms of what the object looked like rather than what it actually was. *See Elliott v. People,* 176 Colo. 373, 490 P.2d 687 (1971).

### C.

██ The defendant asserts as error the admission into evidence of a series of photo-

graphs taken on January 26, depicting the bed, the mattress, and the bullet slug found imbedded in the mattress.

The prosecution established a proper foundation for the admission of the photographs. Sheriff Smith took them during the execution of the search warrant at the Fite home. Their relevance and materiality to the issues at trial are patent. They were offered primarily for the purpose of showing the additional evidence discovered during the belated search of the crime scene. Secondarily they showed some similarity between the stains depicted therein and the blood stains observed and photographed by Sheriff Smith shortly after the shooting. They were properly admitted into evidence. *E. g., People v. Taggert,* Colo., 621 P.2d 1375 (1981); *People v. Glenn,* Colo., 615 P.2d 700 (1980); *Dolan v. Mitchell,* 179 Colo. 359, 502 P.2d 72 (1972); *Potts v. People,* 114 Colo. 253, 158 P.2d 739 (1945).

### D.

██ The other evidential rulings challenged by the defendant relate to the admission of the .38 caliber revolver (exhibit 25), the holster (exhibit 26), the three shell casings and two loaded shells removed from the gun on December 26, 1978 (exhibit 29), the bullet slug recovered from the inside of the mattress on January 26, 1979 (exhibit 28), and Agent Ritter's opinion testimony that the two bullet slugs were fired from the .38 caliber revolver. The defendant claims that the prosecution failed to establish an unbroken chain of custody for the admission of these exhibits and for the testimony of Agent Ritter based thereon.

The character of these items was adequately identified and their connection with the defendant and the crime was sufficiently established to render them admissible without further foundation as to chain of custody. *E. g., People v. Brake,* 191 Colo.

---

9. When the mattress was offered in evidence, the mattress cover had a tear in it, accidently caused by the sheriff after its seizure on January 26, 1979. This alteration in the exhibit was adequately explained by the sheriff's testimony and was not the reason for its exclusion. Also, the mattress had been marked at a prior hearing to depict the position of the victim when he was observed by the sheriff shortly after the shooting. These markings were not a factor in the court's ruling on admissibility either.

390, 553 P.2d 763 (1976); *Mathis v. People*, 167 Colo. 504, 448 P.2d 633 (1968); *Claxton v. People*, 164 Colo. 283, 434 P.2d 407 (1967); *Washington v. People, supra.*

■ The defendant's challenge to Agent Ritter's testimony amounts to pure speculation that the exhibits mailed to the CBI somehow might have been tampered with prior to the ballistics examination and tests. However, the prosecution, as proponent of the evidence, presented an adequate account of the custody of these exhibits at all times and established, with reasonable certainty, the absence of alteration or tampering. The testimony clearly demonstrated that each object, when offered into evidence, was in the same condition as when first recovered by the law enforcement officers. "When it is only speculation that there was tampering, it is proper to admit the evidence and let the jury determine its weight." *People v. Smith*, 182 Colo. 228, 232, 512 P.2d 269, 271 (1973); *accord, People v. Atencio*, 193 Colo. 184, 565 P.2d 921 (1977).

The judgment is affirmed.