**The PEOPLE of the State of Colorado, Plaintiff-Appellee,**

v.

**Melvin BOWMAN, Defendant-Appellant.**

No. 81SA557.

Supreme Court of Colorado, En Banc.

Sept. 26, 1983.

Rehearing Denied Oct. 17, 1983.

---

J.D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Robert Lehnert, John Daniel Dailey, Asst. Attys. Gen., Denver, for plaintiff-appellee.

J. Gregory Walta, State Public Defender, Linda Hotes, Deputy State Public Defender, Denver, for defendant-appellant.

LOHR, Justice.

The defendant, Melvin Bowman, appeals [1] from his convictions of two counts each of first degree murder after deliberation,[2] fel-

---

1. We accepted this case for final determination after it was certified to us by the Colorado Court of Appeals pursuant to sections 13–4–109 and –110, C.R.S.1973.

2. Section 18–3–102(1)(a), C.R.S.1973 (1978

ony murder by arson,[3] and extreme indifference murder,[4] and one count of first degree arson.[5] After trial to a jury in the District Court for Arapahoe County, Bowman was found guilty of all charges and received six concurrent life sentences for the murder convictions and a sentence of twenty-five to thirty years for arson, also to run concurrently. Among numerous other assertions of error, the defendant challenges the limitations imposed by the trial court on cross-examination of Bowman's two stepsons as violative of the defendant's constitutional right to confront the witnesses against him. We agree that the restrictions on cross-examination of one of the youths infringed the defendant's right of confrontation. Therefore, we reverse each of his convictions and remand the case for a new trial.

This prosecution arose from a fire on February 18, 1979, at the Cottonwood Motel in Aurora in the apartment where Bowman lived with his wife, Evelyn, and his three stepsons, Kevin, Anthony and Vincent. Mrs. Bowman and 12-year-old Vincent died in the blaze. The evidence against the defendant included the testimony of his stepsons, Kevin and Anthony. The limitations imposed by the trial court on defense counsel's cross-examination of the youths provides the basis for Bowman's contention that his constitutional right of confrontation was denied. In order to evaluate that claim it is necessary to review the evidence in some detail.

## I. *The Evidence*

The prosecution presented the following evidence. At approximately 7:00 p.m. on February 18, 1979, Debra and Thomas Perry, who lived in the unit adjoining that of the Bowmans, heard an explosion from the

Bowmans' apartment. The Perrys went to their window seconds later and observed the defendant leaving the apartment parking lot in his car. Both of these witnesses accurately described the defendant's car and identified Bowman in the courtroom.

The manager of the motel, Jack Kennedy, testified that, upon being advised of the fire by Bowman's stepson Anthony, Kennedy opened the door of the apartment, found the unit to be full of smoke, and called the fire department. While awaiting the arrival of the firefighters, Kennedy again opened the apartment door and observed flames in the corner away from the door on a bed and nearby chair. Kennedy stated that, just before the firemen arrived, the defendant drove up to the motel parking lot and told Kennedy that he had tried to enter the apartment earlier but the door was hot. Kennedy noticed that Bowman's pant legs were burned. Kennedy also noticed another motel resident, John Hanlon, talking with the defendant in the parking lot. Hanlon later testified that he spoke with a middle-aged black man,[6] whom he could not identify positively, outside of the apartment during the fire. Hanlon stated that the man told him that no one was inside the burning apartment.

Fireman William Jones testified that he spoke with Bowman outside of the apartment after the fire was extinguished. During this conversation, Jones noticed that the defendant's pant legs were burned in front. Bowman indicated that he wanted to enter the apartment because he was cold. Jones denied permission, but obtained a blanket for the defendant, who wrapped it around himself. Lieutenant Fix later obtained the burned pants from the defendant, as explained in part III.A. of this opinion.

Repl.Vol. 8).

**3.** Section 18–3–102(1)(b), C.R.S.1973 (1978 Repl.Vol. 8).

**4.** Section 18–3–102(1)(d), C.R.S.1973 (1978 Repl.Vol. 8) (declared unconstitutional in *People v. Marcy*, 628 P.2d 69 (Colo.1981); amend-

ed in 1981 as section 18–3–102(1)(d), C.R.S. 1973 (1982 Supp.)).

**5.** Section 18–4–102, C.R.S.1973 (1978 Repl.Vol. 8).

**6.** The defendant is black.

Firemen found the two victims fully clothed in the bathtub of the apartment with the shower running. Paramedics administered aid on the scene and then transported the victims to the hospital where they were pronounced dead. Several firemen, policemen, paramedics and doctors noticed the smell of gasoline on the victims' clothing. A coroner testified that each victim died of cardio-respiratory arrest from smoke and fire inhalation, and exhibited carbon monoxide toxicity.

Fire investigators testified that they gathered several samples of materials from the apartment to determine the cause of the fire. Pieces of carpeting and material from the furniture and from the victims' clothing were tested for, and found to contain, a volatile hydrocarbon with the chemical properties of gasoline. Expert testimony established that gasoline had been poured on the furniture and the floor, and that someone was sitting in the chair near the bed when the fire started. One expert expressed the opinion that the flammable fumes were ignited by the pilot light of a space heater that was only a few feet away from where the gas was poured. This expert opined that ignition occurred within the range of two seconds to two minutes after the gasoline was spread.

The defendant's burned pants were also analyzed. An expert testified that the singed areas on the pants were consistent with their presence in the apartment at the moment of ignition because the pants displayed "flash marks" characteristically made only at the point of ignition of a volatile hydrocarbon. The fire would have ignited low to the floor, and the positioning of the singe marks on the lower part of the pant legs was an important basis for this expert's conclusion.

Other evidence recovered from the scene of the crime included a plastic antifreeze container cut into two pieces and smelling like gasoline, and two paper matches burned at the tips. The bottom half of the container was found near the front door of the apartment and the matches were near it. The top half of the container was found outside under a mattress that had been removed from the apartment by the firefighters.

Police found a paring knife from the apartment kitchen in the defendant's coat pocket. The knife had white specks on it, analyzed by experts as having the chemical properties of plastic. Traces of blood, too small for analysis, were present on the antifreeze container. Band-Aid wrappers, a box of Band-Aids and a receipt from Safeway for ninety-six cents plus tax, dated the day of the fire, were found in the defendant's car. A doctor testified that he treated the defendant for a cut finger, requiring stitches, at the hospital after the fire was over.

The foregoing evidence was supplemented by the testimony of Bowman's stepsons. Kevin Toliver, who was eighteen years old at the time of trial, testified that the family had moved to Denver from Chicago a few months before the fire because his mother wanted a "change of life." He stated that on the afternoon of the incident he picked up his little brother Vincent in his car, and the two boys then met their mother at a restaurant-lounge. They purchased four fish dinners to go, and returned to the apartment, where they found the defendant. The defendant was angry that they had purchased only four dinners, and he began to argue with Kevin. Mrs. Bowman then asked Kevin to leave, and he drove to a friend's apartment. Kevin returned home later that evening to find that the firemen and police officers were present. Kevin also testified that he had seen a white plastic antifreeze container in the trunk of Bowman's car on the day before the fire.

On cross-examination, defense counsel attempted to establish that Kevin had lied about seeing the antifreeze container the day before the fire and also had lied about the reasons for the family's move to Denver. When defense counsel inquired: "To your knowledge, was anyone else in the

family having problems in Chicago?" the trial court sustained the district attorney's objection. Out of the hearing of the jury, defense counsel made an offer of proof that Kevin's younger brother Anthony was in "some trouble" in Chicago, and argued that Kevin properly could be cross-examined about it to impeach his account of the reasons for the family's move. Defense counsel also argued that evidence about Anthony's trouble in Chicago would be relevant to his "possible motives." The court held that this was an inappropriate attempt to impeach Kevin on collateral issues and disallowed the line of questioning.

Anthony Toliver, fourteen years old at the time of trial, testified that on the afternoon of February 18, 1979, he was shooting pool with a friend, who drove him back to the Cottonwood Motel at about 7:00 p.m. When he arrived, he saw the defendant in his car driving slowly, first in one direction and then the other, on Colfax Avenue in front of the motel. Anthony saw that the apartment was on fire, and he notified the manager, who called the fire department. Anthony then stopped his stepfather and told him that the apartment was on fire. The defendant replied that he knew and that he had attempted to enter the apartment but the fire burned his pant legs. Anthony also related that the defendant had told him that he had gone to the store to get some beer before the fire started. The day before the fire, Anthony had cleaned Bowman's car. During the course of the project he had seen a Safeway plastic antifreeze container in the trunk of the vehicle, but no Band-Aids or Band-Aid containers were present in the car at that time.

On cross-examination, defense counsel established that the police had taken swabs of Anthony's hands for evidence while he was at the hospital after the fire. Defense counsel asked Anthony if he had given a statement to the police and if he was on probation when he gave the statement. The district attorney's objection to the latter question was sustained. Out of the

hearing of the jury, defense counsel stated that he would establish that Anthony was on probation for a juvenile offense at the time of the fire and that charges of aggravated robbery were also pending against him. The reasons for introducing these matters were to establish that Anthony lied when he testified that he was living with his stepfather during part of February, while he was actually in a juvenile detention facility, and to show that Anthony was resentful toward his parents for placing restrictions on him due to his trouble with the law. These supposed restrictions on Anthony's personal activities supplied "possible motives for having been involved in this incident, himself," according to defense counsel. Defense counsel's theory, although not well developed in his argument to the court, was that Anthony had a motive to start the fire himself and that he also was motivated to testify against the defendant because of resentment and of a desire to divert suspicion from himself.

The court ruled that introduction of evidence of the probation would not be permitted, that evidence of the pending charges would be "totally inappropriate" and that the harm in introducing proof of Anthony's detention would outweigh the benefit in impeaching Anthony on the subject of where he was living in February. Further, the court stated that the witness' testimony had been exculpatory of the defendant so that there was no indication of any resentment toward Bowman, and there was no evidence that Anthony was involved in the fire. After a recess, before continuation of cross-examination, the district attorney informed the court that Anthony had never been adjudicated a delinquent, that he had been involved in the Denver District Attorney's Office diversion program because of a possible offense that was never the subject of a judicial proceeding, and that the pending charge was for burglary, not aggravated robbery. The court then reaffirmed its earlier ruling, admonishing the defense attorney to check his information more carefully. On redirect examination, the prose-

cutor asked Anthony if he had started the fire. Anthony replied, "No."

## II. *Limitation of Cross-Examination*

■ Every defendant is guaranteed the right to confront the witnesses against him by *U.S. Const.* amends. VI and XIV,[7] and *Colo. Const.* Art. II, Sec. 16. A primary interest secured by those constitutional protections is the right of cross-examination. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *People v. Pate,* 625 P.2d 369 (Colo. 1981); *People v. Crawford,* 191 Colo. 504, 553 P.2d 827 (1976); *People v. King,* 179 Colo. 94, 498 P.2d 1142 (1972). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska, supra,* 415 U.S. at 316, 94 S.Ct. at 1110.

Although evidence of pending charges and of misdemeanor convictions is not admissible as bearing on a witness' general credibility, *e.g., People v. Robles,* 183 Colo. 4, 6–7, 514 P.2d 630, 631 (1973), *see* section 13–90–101, C.R.S.1973, "[t]his rule was never intended to prohibit testimony tending to show motive, bias, prejudice or interest of a witness in the outcome of the trial." *People v. King, supra,* 179 Colo. at 98, 498 P.2d at 1144. "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska, supra,* 415 U.S. at 316–17, 94 S.Ct. at 1110, *citing Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). *Accord, People v. Taylor,* 190 Colo. 210, 545 P.2d 703 (1976).

■ In order to give the proper scope to the right of confrontation, a court must allow broad cross-examination of a prosecution witness as to bias, prejudice and motivation for testifying. *People v. Taylor, supra; People v. Key,* 185 Colo. 72, 522 P.2d 719 (1974); *People v. King, supra.* This is especially important as to a witness "charged with or threatened with criminal prosecution for other alleged offenses not connected with the case in which he testifies, and where his testimony against the defendant might be influenced by a promise of, or hope or expectation of, immunity or leniency with respect to the pending charges against him, as a consideration for testifying against the defendant." *People v. King, supra,* 179 Colo. at 98, 498 P.2d at 1144–45. *Accord, People v. Pate, supra; People v. Leonard,* 43 Colo.App. 471, 608 P.2d 832 (1980). The need for wide latitude in cross-examination is also present when a prosecution witness is on probation and his testimony could be prompted by fear or concern for possible jeopardy to his probationary status. *Davis v. Alaska, supra.* A trial court, however, must disallow cross-examination upon matters wholly irrelevant and immaterial to the issues at trial, *People v. Crawford, supra; People v. Taylor, supra,* and has broad discretion to preclude repetitive and harassing interrogation, *Davis v. Alaska, supra,* 415 U.S. at 316, 94 S.Ct. at 1110; *see* C.R.E. 611(a). It is within the framework of the foregoing principles that we evaluate the defendant's contention that the trial court abridged his right of confrontation by limiting cross-examination of Anthony Toliver.

■ Defense counsel sought to call into question Anthony Toliver's motives for testifying against the defendant by cross-examining him as to his involvement with the law. Although defense counsel was not accurately informed of the nature and status of charges against Anthony,[8] the prose-

---

**7.** The federal constitutional guarantee of the right of confrontation is applicable to the states. *Pointer v. Texas,* 380 U.S. 400, 403–06, 85 S.Ct. 1065, 1067–69, 13 L.Ed.2d 923 (1965).

**8.** Although the trial court admonished defense counsel, and properly so, for suggesting the

nature of Anthony's juvenile record to the jury before adequately confirming it, we note that the confidentiality that attaches to certain juvenile records under the Colorado Children's Code, title 19, C.R.S.1973 (1978 Repl.Vol. 8), and practices of local courts and law enforce-

cution conceded that he faced a pending charge for burglary and, based on another possible offense, had been involved in an informal diversion program conducted by the Denver District Attorney's office. Had these facts been brought before the jury, the jurors could have evaluated the extent, if any, to which Anthony's testimony and earlier statement might have been influenced by a desire to obtain favorable treatment from law enforcement authorities in his own cases. Defense counsel also wished to develop that, as a result of his problems with juvenile authorities, Anthony had been subjected by his mother and stepfather to strict rules of conduct and that he resented these restrictions, providing a possible motive for murder. While the court's ruling prohibiting inquiry into Anthony's entanglements with the law arguably did not preclude examination about the rules imposed by his parents, it did prevent full exploration of the reasons for those rules and the possible consequences of breaking them. We conclude that the trial court's restrictions prevented effective cross-examination of Anthony.

The trial court, however, limited cross-examination on the grounds that Anthony's testimony did not tend to incriminate Bowman and thus, implicitly, impeachment would have no relevance to the issues at trial. We disagree. Anthony furnished the only evidence that Bowman was driving slowly back and forth in front of the Cottonwood Motel while the apartment burned. Anthony also supplied the testimony that, when he stopped the defendant to advise him of the fire, Bowman acknowledged that he knew of it. Additionally, Anthony pro-

vided important cumulative evidence. He testified that Bowman offered the explanation that he burned his pant legs while trying to open the door upon his return from the store, a story contrary to the expert testimony that the burns were consistent only with presence of the pants in the apartment at the time of ignition. Anthony and his brother Kevin also supplied evidence inferentially linking the defendant to the container that held the gasoline used to ignite the fire. Anthony's testimony provided important substantiating links in the chain of circumstantial evidence upon which the prosecution's case was built. Denial of the right to develop the nature and status of pending juvenile proceedings to which Anthony was subject prevented the jury from evaluating whether the evidence he gave against the defendant might have been influenced by a promise, hope or expectation of leniency with respect to Anthony's own entanglements with the law, *see People v. King, supra,* by resentment against the defendant based on parental restrictions following from charges against Anthony, or by a desire to divert suspicion from himself, *see Davis v. Alaska, supra.* We hold that the restrictions imposed on the cross-examination of Anthony violated the defendant's right of confrontation under the federal and Colorado constitutions.[9]

Our holding with respect to cross-examination of Anthony makes it unnecessary to consider whether Kevin's cross-examination was also improperly circumscribed. On retrial any objection to the scope of cross-examination of Kevin must be evaluated in light of the principles set forth in this opinion.

ment agencies may make it difficult to ascertain the existence and nature of a juvenile's record of transgressions against the law. In case of doubt, we believe the better practice is to hold an *in camera* hearing to permit the trial court to establish guidelines for cross-examination in this area in light of the available facts.

**9.** The prosecution does not argue that any state statute or policy concerning confidentiality of juvenile records overrides the defendant's right to cross-examine Anthony Toliver on his entan-

glements with the law. Such an argument was made and rejected in *Davis v. Alaska, supra,* where the right of confrontation was found paramount to the state's policy of protecting the confidentiality of records concerning a juvenile offender. *Accord, People v. Pate, supra; People v. Leonard, supra; but see People v. Hinchman,* 196 Colo. 526, 589 P.2d 917 (1978) (a holding apparently limited to its facts by *People v. Pate, supra* ).

### III. *Other Asserted Errors*

In addition to the denial of the right of confrontation, the defendant asserts the following grounds for reversal of his convictions: erroneous denial of challenges for cause to three jurors; failure to instruct the jury properly during voir dire; error in denying defense counsel's motion to suppress certain evidence; error in refusing to allow questioning of a bailiff or the jurors regarding improper communications by the bailiff to the jury; erroneous denial of defense counsel's motion to elect counts; the unconstitutionality of the extreme indifference murder statute, section 18–3–102(1)(d), C.R.S.1973 (before 1981 amendment); and insufficient evidence to support conviction on any of the seven counts.

To provide guidance on retrial, we elect to address the suppression of evidence question, the election of counts issue, the constitutional sufficiency of the former extreme indifference murder statute, and, to a limited extent, the sufficiency of the evidence matter. The other asserted errors are unlikely to recur, and we do not consider them.

### A. *Denial of Motion to Suppress Evidence*

Prior to trial, defense counsel filed a motion to suppress the pair of burned trousers that a fire inspector obtained from the defendant before he was arrested.[10] *See U.S. Const.* amends. IV and XIV; *Colo. Const.* Art. II, Sec. 7. Bowman claims that he did not voluntarily consent to relinquish the pants because he had not been advised of his rights. We find no merit in this argument.

■ A defendant waives his right to challenge the constitutional reasonableness of a search or seizure if he voluntarily consents to the search. *People v. Madson,* 196 Colo. 507, 586 P.2d 1338 (1978). Whether consent is voluntary is a question of fact to be determined by the trial court considering the totality of the circumstances. *E.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973); *People v. Elkhatib,* 632 P.2d 275, 278 (Colo.1981). To be voluntary, the consent must be "the product of an essentially free and unconstrained choice . . . ." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 225, 93 S.Ct. at 2047; *People v. Elkhatib, supra.* A voluntary consent cannot result from express or implied coercion by police; but, while the defendant's knowledge of his right to withhold consent is a factor to be considered, an advisement of this right is not a condition to a finding of voluntary consent. *Schneckloth v. Bustamonte, supra,* 412 U.S. at 246–48, 93 S.Ct. at 2057–59; *People v. Helm,* 633 P.2d 1071 (Colo.1981) (overruling *Phillips v. People,* 170 Colo. 520, 462 P.2d 594 (1969)).

■ The circumstances of this case show that the defendant's consent was voluntary and not the result of coercion. The testimony at the suppression hearing established that Lieutenant Fix of the Aurora Fire Department obtained a change of pants for Bowman from the apartment, at the defendant's request, shortly after the fire had been extinguished. Bowman then went to the hospital after another officer had taken the defendant's name, address and description. Fix later suspected that Bowman might have been involved in the fire, and he spoke with the defendant at the hospital without revealing that suspicion. The lieutenant was wearing jeans and a jean jacket with his badge pinned to the outside, and he informed Bowman that he was a fire department investigator. Fix asked the defendant if he could see the pants Bowman had been wearing earlier, and the defendant consented by taking them out of his car. Bowman removed the contents of the pock-

---

**10.** The defendant also moved to suppress other evidence taken from his person and from his automobile and the apartment. This motion also encompassed certain statements he made to police officers. In this appeal, Bowman does not challenge the trial court's rulings denying suppression of those items of evidence.

ets, and then handed the trousers to Fix. When Fix observed burned spots, he asked Bowman if he could have the trousers, and Bowman replied, "yes."

The evidence supports the ruling of the trial court that, under the totality of the circumstances, Bowman voluntarily consented to relinquish the burned pants to the fire investigator. As in *People v. Elkhatib, supra,* "there was no evidence of coercion, either in the form of an officer's claim of lawful authority to search regardless of the defendant's permission, or a threat or subtle promise calculated to flaw the defendant's judgment. [Citations omitted.] Nor is there any evidence of deception as to the officer's stated purpose" in examining the pants. 632 P.2d at 278. The trial court did not err in allowing the trousers into evidence.

### B. *Election of Counts*

Prior to trial, defense counsel filed a motion for election of counts as to the murder charges, seeking a designation by the district attorney of the theory upon which he would rely at trial. The motion was denied. At the close of all evidence, the motion was renewed and again denied. The defendant argues that denial of the motion was error under sections 18–1–408(3) and 18–1–408(1)(c), C.R.S.1973 (1978 Repl.Vol. 8). We disagree.

 In prosecutions that join several offenses, section 18–1–408(3) provides that the defendant may request that the court require the prosecution, at the close of all the evidence, to elect the count upon which to proceed if the evidence presented has been identical as to multiple counts. The trial court has discretion to require either election of counts or, in the alternative, to impose concurrent sentences if more than one guilty verdict is returned on offenses supported by identical evidence. *People v. Hardin,* 199 Colo. 229, 235, 607 P.2d 1291, 1295 (1980); *People v. Anderson,* 187 Colo. 171, 529 P.2d 310 (1974). Section 18–1–408(3), however, applies only to cases charg-

ing several different offenses. In *People v. Lowe,* 660 P.2d 1261, 1265–71 (Colo.1983), we held that first degree murder is one offense and the different subsections of section 18–3–102 describe the various ways in which that offense may be committed. The trial court does not have discretion to require the prosecution to elect among the first degree murder theories after the evidence is closed. *Id.* at 1271. Therefore, section 18–1–408(3) does not apply to the various theories of first degree murder.

 The defendant argues that section 18–1–408(1)(c) requires the prosecution to elect counts under the circumstances of this case. That section provides only that the defendant may not be convicted of more than one offense if inconsistent findings of fact are required to establish the commission of such offenses. Since murder is only one offense, that statute is inapposite. Moreover, the jury could conclude without inconsistent reasoning that the defendant's actions manifested extreme indifference toward human life, caused death in connection with a knowing perpetration of the felony of arson, and constituted the taking of human life after deliberation.

However, for other reasons expressed in our recent opinion in *People v. Lowe, supra* at 1265–71, we agree with the defendant that only one conviction for first degree murder for each victim may be imposed.

### C. *Extreme Indifference Murder*

 Former section 18–3–102(1)(d), C.R.S.1973 (1978 Repl.Vol. 8), defining the offense of extreme indifference murder, was declared unconstitutional in *People v. Marcy,* 628 P.2d 69 (Colo.1981). Accordingly, the extreme indifference murder counts should be dismissed before retrial.

### D. *Sufficiency of the Evidence*

The defendant argues that the evidence is not sufficient to convict him of arson or murder after deliberation because the only expert testimony presented on the manner of ignition was that the pilot light from the

space heater started the fire.[11] Bowman contends, therefore, that there is no evidence to establish that he "cause[d] to be burned" the apartment, as required by the first degree arson statute, section 18–4–102, or that his actions caused the death of the victims. Under the defendant's analysis, as a matter of law the space heater is a supervening cause breaking the chain of causation.

■ In *People v. Calvaresi*, 188 Colo. 277, 534 P.2d 316 (1975), we approved the following statement of the law with respect to causation in homicide cases:

To warrant a conviction for homicide, the death must be the natural and probable consequence of the unlawful act, and not the result of an independent intervening cause in which the accused does not participate, and which he could not foresee. If it appears that the act of the accused was not the proximate cause of the death for which he is being prosecuted, but that another cause intervened, with which he was in no way connected, and but for which death would not have occurred, such supervening cause is a defense to the charge of homicide.

188 Colo. at 283, 534 P.2d at 319, quoting from 1 *F. Wharton, Wharton's Criminal Law and Procedure* § 200 at 448 (Anderson ed. 1957); *see* 1 *F. Wharton, Wharton's Criminal Law* § 26 (Torcia 14th ed. 1978). In an appropriate case the jury may be so instructed. *See People v. Fite*, 627 P.2d 761, 766–67 (Colo.1981); *Hamrick v. People*, 624 P.2d 1320, 1323–24 (Colo.1981). By the same reasoning, an analogous instruction would be appropriate in an arson case where the evidence presents a question of supervening cause.

The trial court did not instruct the jury on supervening cause, nor did the defendant request it. In advising the jury on the elements of the crimes, the court simply

instructed them that it is essential to a conviction for first degree murder after deliberation that the evidence establish beyond a reasonable doubt that the defendant caused the death, and that in order to convict the defendant of arson he must be shown to have set fire to the structure, burned it, or caused it to be burned. Additionally, the jury's attention was directed to the need to find a causal link between the defendant's conduct and the victim's death by the defendant's theory of the case instruction, setting forth his contention that "the fire ... was the result of accidental ignition of flammable material by a gas heater and was not the result of any actions by Mr. Bowman." Whether this combination of instructions, given without objection or request for supplementation, was adequate to survive plain error review we need not decide because of our holding that reversal is necessary for other reasons.

■ We believe, however, that the law of causation adopted in *People v. Calvaresi* is applicable to the present case and presents issues for the jury to resolve. Thus, had the jury been fully instructed it could have determined whether the fire was the "natural and probable consequence" of spreading the gasoline and not the result of an "independent, intervening cause in which the accused [did] not participate and which he could not foresee" or of a cause "with which he was in no way connected." *See People v. Calvaresi, supra,* 188 Colo. at 283, 534 P.2d at 319; *cf. People v. Fite, supra* (evidence insufficient to raise the issue of supervening cause); *Hamrick v. People, supra* (evidence did not present the issue of supervening cause). We direct that, if the evidence presented on retrial warrants it, the jury should be fully instructed about the law concerning supervening causes as set forth in *People v. Calvaresi, supra.*

We reverse each of the defendant's convictions and remand the case for further

---

11. Although the only expert testimony was that the space heater pilot light triggered the fire, two burnt matches were found near the door.

proceedings consistent with the views expressed in this opinion.

ROVIRA, J., dissents.

ROVIRA, Justice, dissenting.

I respectfully dissent from part II of the majority opinion. Trial courts have broad discretion to control the mode and extent of the presentation of evidence. Unless that discretion is clearly abused, the rulings should not be disturbed on review. *People v. Cole,* 654 P.2d 830 (Colo.1982); *People v. Henry,* 195 Colo. 309, 578 P.2d 1041 (1978); *People v. Bynum,* 192 Colo. 60, 556 P.2d 469 (1976). Constitutional rights to cross-examine witnesses are not absolute and may be limited to accommodate competing interests. *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 1045-46, 35 L.Ed.2d 297 (1973); *Cole,* 654 P.2d at 833.

As I read the majority opinion, two factors lead to the conclusion that the trial judge abused his discretion in limiting defendant's cross-examination of Anthony Toliver. First, the trial judge's decision to prohibit defendant's proposed questions about juvenile proceedings pending against Anthony prevented the jury from evaluating whether Anthony's testimony was influenced by a promise, hope, or expectation of leniency with respect to those juvenile proceedings. But, competing interests favor the trial judge's decision. In general, evidence of pending charges should not be admitted. *People v. Robles,* 183 Colo. 4, 6-7, 514 P.2d 630, 631 (1973); *see* section 13-90-11, C.R.S.1973. This interest is particularly strong when juvenile proceedings are involved. *See* section 19-1-109(2), C.R. S.1973.

The majority cites two cases, *People v. King,* 179 Colo. 94, 498 P.2d 1142 (1972), and *People v. Pate,* 625 P.2d 369 (Colo.1981), to support its weighing of the competing interests in favor of finding that the trial judge abused his discretion. These cases are distinguishable. *King* involved the testimony of a paid, planted informant. In contrast, law enforcement authorities had nothing to do with Anthony's presence during the events that formed the basis of his testimony. Anthony's mother and brother were killed in the fire allegedly set by defendant, who is Anthony's stepfather. The inference that Anthony's testimony may have been influenced by a promise, hope, or expectation of leniency with respect to independent proceedings against him is much weaker than the inference in *King.*

A similar analysis applies to *Pate.* There, the dispositional hearings of the juvenile witnesses were purposely postponed until after the defendant's trial. The juveniles admittedly participated in the crimes charged against the defendant. *Pate,* 625 P.2d at 369. The inference that these juvenile witnesses may have been influenced by promises, hopes, or expectations of leniency vis-a-vis their own pending proceedings is much stronger than in the instant case, since no similar links were shown with respect to Anthony's pending proceedings.

The trial judge in the instant case refused to allow this line of cross-examination because, *inter alia,* defendant had not laid an adequate foundation. Under these circumstances, the trial judge was correct in requiring more facts linking Anthony to possible promises, hopes, or expectations of leniency in the proceedings against him before balancing the competing interests in favor of allowing the cross-examination in question.

*Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), is also distinguishable. As the trial judge here points out, *Davis* involved a juvenile who had been adjudicated delinquent and placed on probation prior to Davis' trial. *Davis,* 415 U.S. at 311, 94 S.Ct. at 1108. The inference that Anthony's testimony might have been influenced by fears of jeopardizing his position is weaker since he had not been adjudicated delinquent, but had been merely charged with an offense and involved with an informal diversion program at the time of Bowman's trial.

The second factor relied upon by the majority relates to the restrictions placed on Anthony by his mother and the defendant. The majority maintains that defendant should have been able to explore the restrictions during cross-examination to develop two theories. First, Anthony may have testified falsely against the defendant because of the malice that Anthony felt due to the restrictions. Second, Anthony may have set the fire in retaliation and testified falsely against his stepfather to divert suspicion from himself.

During cross-examination, a trial court may exercise its sound discretion to preclude inquiries that have little bearing on the witness' credibility but would substantially impugn his moral character. *Cole,* 654 P.2d at 832; *People v. Taylor,* 190 Colo. 210, 545 P.2d 703 (1976). In his offer of proof, the specific restrictions mentioned by defendant's counsel were not onerous: Anthony could not have friends at home and he had to stay home after school. It seems highly unlikely that these parental restrictions would motivate Anthony to kill his mother and his brother, or to testify falsely against his stepfather in a first-degree murder prosecution. Thus, the trial judge could reasonably conclude that the inquiries about the restrictions would have little bearing on Anthony's credibility.

For the reasons stated above, I conclude that the trial judge did not clearly abuse his discretion in limiting the cross-examination of Anthony Toliver. Defendant's constitutional right to confront and to cross-examine witnesses was not abridged. Therefore, I would not reverse defendant's convictions on that basis.