23CA0219 Peo v Jeannoutot 08-21-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0219
Weld County District Court No. 21CR319
Honorable Marcelo A. Kopcow, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Carl Daniel Jeannoutot,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUSTICE MARTINEZ*
Kuhn and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 21, 2025

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph Paul Hough, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1   Defendant, Carl Daniel Jeannoutot, appeals the district court's judgment of conviction entered on jury verdicts finding him guilty of eight counts of sexual assault on a child under the age of fifteen as part of a pattern of abuse by a person in a position of trust. We affirm.

## I. Background

¶ 2   Jeannoutot lived with his cousin, D.J., his cousin's wife, C.J., their son, and their two daughters, K.A. and M.J. He stayed in their home between April and December 2020, but left at times because of conflicts with D.J. and C.J.

¶ 3   K.A. and M.J. told their parents that Jeannoutot had sexually abused them when he lived in their home. M.J. had told K.A. about the earlier sexual assaults, but K.A. did not initially believe her sister. She believed her sister after Jeannoutot began to abuse her. However, neither of the girls told their parents about the assaults until later.

¶ 4   Once the children's parents learned about the assaults, they told Jeannoutot's mother, who insisted they call the police. A forensic interviewer from Life Stories Child and Family Advocacy Center interviewed the children. Subsequently, Jeannoutot was

1

charged with the eight counts of sexual assault on a child and one count of criminal attempt to contribute to the delinquency of a minor.

¶ 5     At trial, the court admitted a video of the forensic interviews in evidence, without objection from the defendant and without any limitation on the jury's use of the interviews.  In addition to viewing the video of the interviews, the jury also heard testimony from K.A., M.J., the victims' brother and parents, Jeannoutot's mother, police officers, the forensic interviewer, and a generalized expert witness in sexual assault victim dynamics.  Jeannoutot testified in his defense and told the jury that the accusations against him were untrue.  To support his defense, Jeannoutot testified that K.A. and M.J. made the stories up to get attention from their parents and their parents used the stories to target him for their own ulterior motives.

¶ 6     The jury returned guilty verdicts on the eight counts of sexual assault on a child but acquitted him of the attempt to contribute to the delinquency of a minor.  The district court sentenced Jeannoutot on each of the eight counts, some sentences concurrent and some consecutive to each other, for a controlling indeterminate

sex offense term of fifty-six years to life in the custody of the department of corrections.

## II.    Discussion

¶ 7      On appeal, Jeannoutot contends that the evidence was insufficient on one count, the court improperly limited cross-examination, the expert witness improperly opined on the victims' truthfulness, there was misconduct by the prosecutor, and there was cumulative error.  We review all of these contentions and disagree with each of them.

### A.    Sufficiency of the Evidence of Count Nine

¶ 8      Jeannoutot first contends that there was insufficient evidence to conclude that he committed the sexual assault of a child charged in count nine.  Specifically, he argues that because K.A.'s in-court testimony — that Jeannoutot did not place his penis on her buttocks — contradicted her out-of-court forensic interview, the jury's verdict must be reversed.  We disagree.

#### 1.    Additional Facts

¶ 9      K.A. told the forensic interviewer about two separate instances when Jeannoutot had assaulted her.  The incidents were charged in two separate counts.  Supporting count five, K.A. told the

interviewer that Jeannoutot took her into his bed and asked her to be his "teddy bear." Then he touched K.A. "down there," put his hand under her spandex, and touched her vagina over her underwear.

¶ 10     In count nine, Jeannoutot was charged with "unlawfully, feloniously, and knowingly, subject[ing] [K.A.] . . . to sexual contact and the victim was less than eighteen years of age, and the defendant was in a position of trust with respect to the victim . . . [by] touching [K.A.'s] butt with [Jeannoutot's] penis and promising credits on Roblox." Roblox is an online game.

¶ 11     K.A. told the interviewer that Jeannoutot sat on her bed while she was playing Roblox. Jeannoutot closed her bedroom door, hugged her, and held her down. He then "starts to go down there" and she said she knew Jeannoutot wanted to "put his thing in [her] butt," "[b]ecause he kept on pushing [her] on [her] side. He kept on putting his thing against [her] butt." K.A. also told the interviewer that she knew that Jeannoutot did the same thing to M.J., and that's how she knew that he wanted to put his thing in her butt. But when K.A. told him to stop or she would tell her parents,

4

Jeannoutot stopped and agreed to buy Roblox credits for K.A. in exchange for her silence.

¶ 12    At trial, K.A. testified about the first incident, when Jeannoutot put his hands down her pants and touched her vagina. But K.A. said she couldn't remember an incident where Jeannoutot placed "his thing" on her butt. Indeed, she said, "I think that was about [M.J.], not me." The prosecutor asked whether K.A. remembered talking to the forensic interviewer over a year before trial and asked whether K.A. tried to remember correctly at the interview. K.A. said that she had tried.

2.    Standard of Review and Applicable Law

¶ 13    We review de novo a sufficiency of the evidence claim. *McCoy v. People*, 2019 CO 44, ¶ 27. In doing so, we consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Id.* at ¶ 63 (quoting *People v. Bennett*, 515 P.2d 466, 469 (1973)) (other citation omitted).

¶ 14 For evidence to be sufficient for a criminal conviction, it must be more than a modicum of relevant evidence and cannot include mere guesses, speculation, or conjecture. *People v. Price*, 2023 COA 96, ¶ 17 (citing *People v. Sprouse*, 983 P.2d 771, 778 (Colo. 1999)). But "[w]e do not speculate on the merits of the evidence or usurp the jury's conclusions." *Clark v. People*, 232 P.3d 1287, 1293 (Colo. 2010) (citing *People v. Aalbu*, 696 P.2d 796, 811 (Colo. 1985)). We will not reassess a jury's determination of facts that are properly explored through direct witness testimony and cross-examination. *See id.*

### 3. Analysis

¶ 15 We conclude that the inconsistency between K.A.'s out-of-court statement in the forensic interview and her in-court testimony at trial was an issue of credibility for the jury to resolve. Because the jury found Jeannoutot guilty of count nine, it must have decided that K.A.'s testimony in the forensic interview was more credible than her in-court testimony.

¶ 16 It is the duty of the jury to weigh witness credibility and resolve conflicting testimony. *People v. Randolph*, 2023 COA 7M, ¶ 33 (citing *People v. Poe*, 2012 COA 166, ¶ 14). The jury in this

6

case asked to see K.A.'s forensic interview again during deliberations, which may indicate that the jury considered the interview in light of K.A.'s in-court testimony that she couldn't recall the incident.

¶ 17 Moreover, K.A.'s forensic interview account included specific detail. For example, she recalled that she was playing Roblox when Jeannoutot entered her room. And she said that after Jeannoutot began placing his penis on her butt, she attempted to stop him and agreed to stay silent in exchange for Roblox credits. K.A. also said that she remembered what M.J. had told her about what Jeannoutot did to M.J., because when he started to repeat that same behavior, she knew that he planned to "put his thing in [her] butt."

¶ 18 There is sufficient evidence for the jury to have found that her statement in the interview had credible detail and Jeannoutot was guilty of count nine. We will not reweigh conflicting evidence and substitute our judgment for the jury's. *Clark,* 232 P.3d at 1293. Regardless of how the jury resolved the credibility issue, K.A.'s statement in the forensic interview was substantial and sufficient to

support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.

## B.    D.J.'s Cross-Examination

¶ 19    Jeannoutot next contends that the district court erred by preventing cross-examination about D.J.'s alleged involvement in an arson case in violation of Jeannoutot's Sixth Amendment right to confront adverse witnesses.  We conclude that the district court abused its discretion by applying the wrong legal standard to Jeannoutot's offer of proof, but we conclude the error does not require reversal because it was harmless beyond a reasonable doubt.

### 1.    Preliminary Proceedings

¶ 20    Before trial, Jeannoutot's counsel indicated that she wanted to cross-examine D.J. about his motive and bias to testify against Jeannoutot based on a specific instance of uncharged, alleged arson.  She said that on June 13, 2020, D.J. and Jeannoutot were stopped by a traffic police officer shortly after one or both of them set fire to M.O.'s house.  M.O. supposedly sold D.J. low-quality methamphetamine earlier that day.  Although Jeannoutot was the only person charged with arson, his counsel argued that she should

be allowed to ask D.J. about his involvement in the arson to show his motive to cooperate with the prosecution and his bias against Jeannoutot.

¶ 21 At a hearing on the arson issue, Jeannoutot's counsel said she was willing to make an offer of proof but that she was concerned about introducing the evidence at that time because it related to her "client's constitutional right with regards to testifying or not testifying in this case."

¶ 22 During the trial, Jeannoutot's counsel made an offer of proof that the defense would introduce the following evidence: D.J. drove to M.O.'s house with Jeannoutot in the car; D.J. was angry with M.O. and thus had a motive to throw the Molotov cocktail (an incendiary device) at the house; Jeannoutot and D.J. were pulled over by a patrol police officer wearing a body worn camera shortly after the arson; the detective investigating the arson case met with D.J. about the case; D.J. refused to voluntarily give the detective a DNA sample for testing; and D.J. kicked Jeannoutot out of the home because of his involvement in the arson case.

¶ 23 The district court precluded the cross-examination, finding there was no credible evidence that the prosecution had plans to

charge D.J., and that Jeannoutot had not proved by a preponderance of the evidence that D.J. was involved with the arson. The court reasoned that the probative value of the arson evidence had no logical or legal relevance to the case, and therefore, the anticipated questioning and testimony had little to no probative value while prejudice to the prosecution was high. However, the court told Jeannoutot's counsel that it was willing to reconsider the issue if Jeannoutot decided to testify or present the court other evidence of the arson.

## 2. D.J.'s Trial Testimony

¶ 24 At trial, D.J. testified that he had open heart surgery on April 30, 2021, which made him comatose for twenty-seven days. He indicated that the coma affected his memory, and that his memories from three to five years before the surgery were "really fuzzy" and "out of chronological order." As a result, he could not remember much about the events in 2020 when Jeannoutot lived in his house and only remembered "little bits."

¶ 25 D.J. testified he did not recall the events at issue in Jeannoutot's case. His response to many questions was simply that he did not recall. He did say that Jeannoutot "was hanging out

with the kids a lot and that's about it." He described K.A., M.J., and his son's personalities and said that if something was wrong, K.A. and M.J. would tell him. He testified that his children use their phones a bit. He said that he did not recall talking to K.A. or M.J. about sex when they were younger and did not talk about it with them now. His direct testimony did not corroborate the victims' testimonies, touch on the truthfulness or veracity of their testimony, or otherwise support the prosecution's case.

¶ 26 Jeannoutot's defense counsel cross-examined D.J. about a charge pending against him for felony drug distribution with possession of a gun. She asked, and D.J. confirmed, that the same prosecutor's office was in charge of both Jeannoutot's case and D.J.'s pending felony case. Defense counsel also cross-examined him about his four felony convictions: possession of drugs with intent to distribute, felony motor theft, eluding a police officer, and dishonesty theft. D.J. told the prosecutor on redirect that the prosecutor's office had not offered him anything in exchange for his testimony in Jeannoutot's case.

### 3. Jeannoutot's Offer of Proof and Court's Ruling

¶ 27 The day after D.J. testified for the prosecution, Jeannoutot's counsel renewed and elaborated upon her offer of proof with police reports about the arson case.

¶ 28 The reports included information that Jeannoutot had spoken to a detective on March 10 and 15, 2021, about the arson. In those interviews, he said that on June 13, 2020, D.J. got methamphetamine from the victim of the arson, M.O., and later complained that M.O.'s "dope was 'crap'" and was "[f]ake dope that bubbled up in the pipe."

¶ 29 After D.J. got intoxicated on different methamphetamine and alcohol, he reportedly told Jeannoutot that he wanted to get back at M.O. for the fake dope but was too intoxicated to drive and asked Jeannoutot to drive him to M.O.'s house. Jeannoutot said he did not want to participate but D.J. threatened that he would kick Jeannoutot out of his house and call Jeannoutot's parole officer if he did not help. Jeannoutot said he relented.

¶ 30 Jeannoutot also told the detective that D.J. then drove the car and nearly crashed into another vehicle. Then Jeannoutot drove the car to M.O.'s house while D.J. made two Molotov cocktails out

12

of beer bottles. Jeannoutot said D.J. threw one bottle that hit the roof and landed in M.O.'s backyard. He said D.J. tried to throw the second device into M.O.'s truck but when he couldn't break the truck window, he threw it at a house window.

¶ 31 The detective reported that Jeannoutot said when he drove away from the house, he was stopped by a traffic patrol officer because the car he was driving matched the description of one reported for reckless driving. Jeannoutot said he got a citation for driving without a license and because D.J. was intoxicated and in his boxers. Then they called C.J. to bring them back to their house. Jeannoutot said that he did not participate in the arson but was forced to drive because he was worried about being kicked out of D.J.'s house and going back to prison.

¶ 32 After Jeannoutot's interview, the detective found a police record for a traffic stop showing that Jeannoutot got a citation for driving without a license. Body worn camera footage from the stop confirmed that D.J. was a passenger in the car, appeared to be intoxicated, and admitted to being intoxicated. Damage to the house's windowpane and M.O.'s truck window matched Jeannoutot's account. The arson timeline was consistent with

Jeannoutot's version of events: the arson happened a few minutes before the 11:33 p.m. traffic stop and the arson was reported at 11:44 p.m.

¶ 33     In another report, the detective recounted an interview with D.J. on March 18, 2021. The detective said she had body camera footage of D.J. as a passenger in a car with Jeannoutot on the night of the arson when Jeannoutot was pulled over and cited for driving without a license. After initially denying it, D.J. said Jeannoutot had just picked him up from a friend's house where he had been drinking and could not drive himself home. He said that Jeannoutot must have committed the arson before he picked D.J. up. D.J. refused to submit to a voluntary buccal swab for DNA.

¶ 34     D.J. told the detective he had never met M.O. and did not know where M.O. lived. He said he believed Jeannoutot had told M.O. that D.J. did the arson because M.O. sent D.J. threatening messages on Facebook Messenger. D.J. showed the detective those messages including M.O. saying, "eye for an eye" and to "watch your back[.]" D.J. and M.O. exchanged derogatory profanities in their messages.

¶ 35     The prosecutor said that a Deputy District Attorney had reviewed the arson case and "charges were filed as our office did see it appropriate at the time." Jeannoutot was charged and D.J. was not.

¶ 36     The court found that even with this evidence, it would continue to preclude Jeannoutot's counsel from cross-examining D.J. on the uncharged arson because he had not proved D.J.'s involvement by a preponderance of the evidence. It found that there was "no credible evidence" linking D.J. to the arson, and that even after giving the maximum probative value of that cross-examination evidence, the value was outweighed by the prejudicial effect on the prosecution.

4.     Standard of Review and Applicable Law

¶ 37     The United States Constitution guarantees the right of a criminal defendant to confront witnesses against him. U.S. Const. amends. VI, XIV. Cross-examination is the primary interest secured by that right. *People v. Margerum,* 2018 COA 52, ¶ 24 (citing *Davis v. Alaska,* 415 U.S. 308, 315 (1974)). Accordingly, "the right of confrontation requires courts to allow broad cross-examination of a prosecution witness as to bias, prejudice, and

15

motivation for testifying."  *Id.* at ¶ 26 (citing *People v. Bowman,* 669 P.2d 1369, 1375 (Colo. 1983)).  To cross-examine a witness about bias, prejudice, or interest in the outcome of the trial, a defendant must "merely show the possibility, that the witness's testimony was being influenced by a promise for, or even only mere hope or expectation of, leniency with the pending charge in exchange for favorable testimony against the defendant."  *Kinney v. People,* 187 P.3d 548, 560 (Colo. 2008).

¶ 38    But district courts retain considerable discretion when deciding evidentiary issues.  *People v. Beverly,* 2025 CO 18, ¶ 22 (citing *People v. Elmarr,* 2015 CO 53, ¶ 20); *People v. Williams,* 2025 COA 26, ¶  28 ("We review evidentiary rulings, including those concerning the admission of lay witness testimony, for an abuse of discretion.").  Courts may impose reasonable limits on the cross-examination of witnesses.  *Margerum,* ¶ 25 (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986)); *Kinney,* 187 P.3d at 559.  An offer of proof must show that there is evidence that would assist the fact finder to understand other evidence or help determine a fact at issue.  *People v. Lanari,* 926 P.2d 116, 121 (Colo. App. 1996) (citing *Melville v. Southward,* 791 P.2d 383 (Colo. 1990)).  In part, the court

must determine the extent of the foundational evidentiary basis and scope and content of the evidence. *See id.* We review such evidentiary rulings for an abuse of discretion — meaning the evidentiary ruling cannot be manifestly arbitrary, unreasonable, or unfair, or stem from an erroneous view of the law. *Beverly*, ¶ 25 (citing *Elmarr*, ¶ 20).

¶ 39 If we conclude that a court's abuse of its discretion was of a constitutional dimension, we review the reversal under a constitutional harmless error standard. *Hagos v. People*, 2012 CO 63, ¶ 11; *see People v. Phillips*, 2012 COA 176, ¶ 93 ("Confrontation Clause violations are trial errors subject to constitutional harmless error review."). A constitutional error requires reversal unless the reviewing court is "able to declare a belief that [the error] was harmless beyond a reasonable doubt." *Hagos*, ¶ 11 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). We reverse if "there is a reasonable possibility that the [error] might have contributed to the conviction." *Id.* (quoting *Chapman*, 386 U.S. at 24)).

### 5. The District Court Abused Its Discretion

¶ 40 The district court here abused its discretion because it applied the incorrect legal standard to Jeannoutot's offer of proof. The

district court required Jeannoutot to prove D.J.'s involvement by a preponderance of the evidence. But Jeannoutot only had to offer proof that evidence would help the jury understand that D.J. had a potential bias for testifying against Jeannoutot. *See Lanari*, 926 P.2d at 121. Such evidence was admissible so long as it would show the possibility that D.J.'s testimony against Jeannoutot was influenced by the mere hope or expectation of leniency with a potential arson charge. *See Kinney*, 187 P.3d at 560.

¶ 41 The police record placed both Jeannoutot and D.J. in the immediate area of the arson mere minutes after it started and before someone reported it. Jeannoutot also corroborated details from body worn camera footage that D.J. was intoxicated and in his boxers on the night in question.

¶ 42 Jeannoutot's statements in the interviews revealed a motive for D.J. to commit the arson as an act of revenge for receiving "fake dope" from M.O. D.J. later confirmed that M.O. had accused him of committing the arson. D.J. showed the detective an expletive-filled exchange between D.J. and M.O. about the arson and M.O. getting revenge on D.J. for it.

¶ 43   Further, Jeannoutot's statements were consistent with the physical evidence collected at the scene of the arson including damage to M.O.'s truck window and damage to the house's windowpane.  It is possible that Jeannoutot only knew those details because he committed the arson without D.J., but it is also possible that D.J. had sufficient involvement such that D.J. was concerned.

¶ 44   It remained within the discretion of the district court to limit the questioning of D.J. about the arson to avoid confusing the jury and creating a distraction.  We do not suggest that all the evidence in the offer of proof was admissible, but Jeannoutot's offer showed sufficient grounds to question D.J. about his motive and bias.  Thus, the court abused its discretion by prohibiting any questions at all about D.J.'s possible motives and bias stemming from the arson investigation.

6.   The Error Was Harmless Beyond a Reasonable Doubt

¶ 45   We conclude that the error was harmless beyond a reasonable doubt for three reasons.

¶ 46   First, D.J. recalled so very little that his testimony was not at all damaging to Jeannoutot, and it did not contradict Jeannoutot's defense.  The little D.J. did recall was cumulative of other evidence,

19

for example that Jeannoutot spent time with the girls. To the extent that questioning D.J. about the arson might have shown that D.J.'s testimony was not credible, and the jury might have wholly disregarded his testimony, it could not have had any effect on the issues at trial. *See People v. Munoz*, 240 P.3d 311, 320 (Colo. App. 2009) (error resulting from testimony was harmless because an earlier witness had already provided the same information); *People v. Allee*, 77 P.3d 831, 835 (2003) (testimony that was erroneously admitted was harmless because the same testimony was given by other witnesses without objection). Because D.J.'s testimony had little or no effect on the strength of the case against Jeannoutot, the lack of cross-examination about the arson investigation caused no harm. *See People v. Grudznske*, 2023 COA 36, ¶ 79.

¶ 47 Second, it is unlikely D.J. would have recalled anything about the arson investigation. D.J. replied he could not recall the events in question over sixty times during his testimony, due to memory loss after he was in a coma. If he did recall anything, it is likely he would have denied any involvement in the arson as he had in the police interview, and it is unlikely the questioning could have proceeded any further.

¶ 48    Third, Jeannoutot's counsel did cross-examine D.J. on his motivation and bias stemming from possible prosecution, albeit not about possible arson charges but instead about a pending felony charge of drug distribution with possession of a gun.  She also cross-examined D.J. with his four felony convictions.  Despite the court's preclusion of cross-examination on the arson, the jury still had evidence that D.J. had a motivation to cooperate with the prosecution on a pending charge.  *See United States v. Purkey*, 428 F.3d 738, 753-54 (8th Cir. 2005) (harmless error where the defendant's counsel "demonstrated by other means" that the witness had a desire for leniency with the prosecution); *United States v. Gaines*, 8 Fed. Appx. 635, 640-41 (9th Cir. 2001) (harmless error where the jury heard "plenty of other evidence" impeaching the witness's credibility).

## C.    K.A.'s Testimony

¶ 49    Jeannoutot contends that the court abused its discretion by preventing cross-examination of K.A.'s opinion of M.J.'s truthfulness.  We disagree.

### 1. Additional Facts

¶ 50 During K.A.'s cross-examination, Jeannoutot's counsel asked K.A. why she did not initially believe M.J. when M.J. told her that Jeannoutot had sexually assaulted M.J. His counsel asked, "I also hear you say that [M.J.] likes to make up a lot of stories?" K.A. replied, "She doesn't make up stories, really. She's mainly truthful, but, if it comes to, like pulling a prank on me, then she'll act funny and stuff, and I'll know that she's just kidding." Jeannoutot's counsel went on to ask, "When [M.J.] initially told you, you did not believe her that Jeannoutot had done anything to her, right?" K.A. replied, "I didn't believe her at first, yeah."

¶ 51 The prosecutor then objected to four follow-up questions: (1) "You did not believe her, because she had . . . ."; (2) "You did not believe her because she had been untruthful . . . ."; (3) "You said that you did not believe her. Is there a reason you did not believe her?"; and (4) "So, when [M.J.] first talked to you one time, and then talked to you another time about what she claimed Jeannoutot had done, your first thought on the second time she told you was that she was making up a . . . ." The court sustained all four objections. After K.A.'s testimony concluded, Jeannoutot's counsel made an

offer of proof that had she been allowed to ask K.A. those questions, K.A. would have told the court that M.J. had not been truthful in the past with K.A.

### 2.  Applicable Law

¶ 52    "The credibility of a witness may be attacked or supported by evidence *in the form of opinion or reputation*[.]"  CRE 608(a) (outlining two limitations not relevant to our analysis) (emphasis added).  Further, "a witness may testify as to his opinion of, or the reputation of, another witness for truthfulness or untruthfulness." *People v. Ortega*, 672 P.2d 215, 219 (Colo. App. 1983) (citations omitted).  But specific instances of conduct of a witness may not be proved by extrinsic evidence.  CRE 608(b); *People v. Cole*, 654 P.2d 830, 832 (Colo. 1982) ("[A]s a general rule[,] specific instances of prior conduct may not be proven by extrinsic evidence to impeach the credibility of the witness.").

### 3.  Analysis

¶ 53    Jeannoutot's counsel attempted to introduce testimony from K.A. that there were specific instances when M.J. was not truthful. After hearing K.A.'s response about whether she believed M.J. to be truthful generally, his counsel asked questions about why K.A.

initially did not believed M.J. when she told K.A. about Jeannoutot's sexual assault. With these follow-up questions, counsel was no longer asking about reputation for truthfulness generally but instead was attempting to elicit testimony that M.J. had been untruthful on other occasions. The district court properly exercised its discretion by excluding any testimony about such specific instances of M.J.'s conduct. *See Beverly*, ¶ 22.

### D. Expert Witness Testimony

¶ 54 Jeannoutot contends that the district court abused its discretion when it allowed the prosecution's expert witness to testify about the patterns she had seen in fabricated allegations of sexual assault. Because his counsel did not object to this testimony at trial, Jeannoutot also contends that the error was plain. We do not agree that the district court erred.

### 1. Additional Facts

¶ 55 The prosecution called Jean McAllister to testify as an expert in interpersonal violence which she described as "circumstances related to child abuse, child sexual abuse, [and] sexual assault" among other subjects. The court admitted her as an expert in the field of sexual assault victim dynamics under CRE 712.

¶ 56    During cross-examination, Jeannoutot's counsel asked McAllister, "And today, as part of your opinion, you're not saying that children or adolescents are not capable of fabricating an event, or events, correct?"  McAllister responded, "I have not said that.  It is rare that sexual abuse fabrications are made.  They happen, I identified some when I was . . . a psychotherapist, and *there are consistent patterns of how those happen typically*."  (Emphasis added.)

¶ 57    On redirect, the prosecutor asked McAllister to elaborate on her colloquy with Jeannoutot's counsel:

> Prosecutor: You're not telling this jury that children could never make up sexual abuse allegations about somebody.  Do you remember being asked that question?
>
> McAllister: Yes.
>
> Prosecutor: And I think your answer was that you've actually been called upon to identify that before?
>
> McAllister: I did identify it in a couple of cases, and I have been called upon to identify it.
>
> Prosecutor: Okay.  And you agree that's not what you're being asked to do here?
>
> McAllister: I am not.

Prosecutor: But, you said there were patterns that tend to crop up when that's the situation. Can you tell the jury what those patterns are?

McAllister: First of all, you wouldn't have that primary experiential memory in a false or fabricated report in most cases. Kids don't know how to describe what it feels like to be sexually abused if they haven't been sexually abused. In cases where kids are pressured by another parent when there's a separation, to report something, typically their descriptions are not based in primary sensory experience, and they sometimes include language that's more adult than they would have in their personal experience.

Kids who are making up, and typically they're older adolescents, but one of the things is, that when people make false reports, older adolescents are often trying to get out of trouble for something, and they disclose that they've been sexually assaulted. And, they almost never identify a specific person, because they still have the beliefs that many people do, that most sex assault is from a scary stranger, and "I didn't do what I was supposed to do 'cause some scary stranger grabbed me on the way home and sexually assaulted me," or, "I was way across town where I wasn't supposed to be 'cause somebody pulled me in their car, and I, and took me across town and dumped me." So, it's more to get out of being in trouble for where they are or what they're doing in those kinds of cases. Fabrications do happen.

Jeannoutot's counsel did not object and chose not to recross McAllister.

### 2. Standard of Review and Applicable Law

¶ 58  "'We review a trial court's admission of expert testimony for an abuse of discretion and will reverse only when that decision is manifestly erroneous.'" *People v. Cooper*, 2021 CO 69, ¶ 44 (quoting *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011)).  Because Jeannoutot's trial counsel did not object to the expert testimony, we would reverse only for plain error.  We reverse under plain error review only if the error "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction."  *Hagos*, ¶ 14 (quoting *People v. Miller*, 113 P.3d 743, 748-50 (Colo. 2005).

¶ 59  "Generalized expert testimony may not bolster the credibility of a victim by impermissibly implying that she is telling, or has previously told, the truth about the charged incident."  *Cooper*, ¶ 95 (citing *Venalonzo v. People*, 2017 CO 9, ¶¶ 32-34); *see also People v. Wittrein*, 221 P.3d 1076, 1081 (Colo. 2009) ("In Colorado, neither lay nor expert witnesses may give opinion testimony that another witness was telling the truth on a specific occasion.").  But

27

"generalized expert testimony" about a topic that does not touch upon the truthfulness of a victim's testimony or opine about the veracity of that testimony may be incidental and acceptable. *See Cooper*, ¶ 97. That generalized expert testimony must fit the facts in the case, meaning it must have a sufficient logical connection to the facts of the case to be helpful and clear the evidentiary bar of CRE 403. *Id.* at ¶ 98; *see* CRE 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

### 3. Analysis

¶ 60 Jeannoutot's counsel asked McAllister whether alleged child victims of sexual assault sometimes fabricate their allegations. She did so because Jeannoutot's theory of defense was that K.A. and M.J. had fabricated the accusations against him. In her response, McAllister indicated that there are consistent patterns of how fabrications happen. On redirect, the prosecutor asked McAllister to elaborate on those patterns. The reason for this elaboration is clear: those patterns could help the jurors determine, in their

weighing of the expert and victim testimony, whether the victims' testimony matched McAllister's patterns of fabrication.

¶ 61 Jeannoutot contends that McAllister's testimony attempted to corroborate K.A.'s and M.J.'s testimonies, and that the expert testimony's purpose was to impermissibly bolster the victims' credibility and truthfulness.

¶ 62 But McAllister testified repeatedly that she did not know or understand the allegations in Jeannoutot's case; she had not met with K.A., M.J., or Jeannoutot;and had not read police reports, victim statements, or any other document about the case except the subpoena that listed Jeannoutot as the defendant in the case. Directly before the colloquy with Jeannoutot's counsel about the question of fabrication, McAllister confirmed "I'm offering general information. I'm not here to make any statements about the facts of the case at all."

¶ 63 McAllister never opined about the victims or the defendant in this case. Nor did she testify that victims never fabricate but instead opined that fabrication is rare. Indeed, McAllister indicated that fabrication was possible and she had worked in previous cases where a purported victim had fabricated sexual assault. Nothing in

McAllister's description of sexual assault fabrication directly touched on facts in this case, but her testimony could help the jury confirm or refute the defense's theory that the victims had fabricated.

¶ 64 Thus, we conclude that McAllister's generalized testimony had a logical connection to the facts in the case and was helpful to the jury while clearing CRE 403's bar. *See Cooper*, ¶ 98.

### E. Prosecutorial Misconduct

¶ 65 Jeannoutot contends that the district court plainly erred by allowing the prosecutor to misrepresent McAllister's testimony in closing argument. We disagree.

#### 1. Additional Facts

¶ 66 The prosecutor referred to McAllister's testimony in her closing and rebuttal arguments. In one instance, the prosecutor said, "[K.A.'s and M.J.'s accounts] are corroborated stories. These are stories not only corroborated by other people that were in the house, they're corroborated by Jean McAllister." The prosecutor also characterized McAllister's testimony as saying false allegations are "super rare."

[McAllister], who's an educator, she's not giving her opinion. She's giving you education [and] said false allegations, if false allegations happen in sexual assault, it's super rare, right? She said it's super rare and when it does happen, it's usually something like stranger rape, right?

¶ 67    Jeannoutot's counsel did not object to either reference.

### 2.    Standard of Review and Applicable Law

¶ 68    In determining claims for prosecutorial misconduct, we use a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). When considering the first step, we determine whether the conduct was improper based on the totality of the circumstances. *Id.* We consider the comments in the context of the argument as a whole and view the comments in light of the evidence before the jury. *People v. Samson*, 2012 COA 167, ¶ 30. We give wide latitude to argue based on the facts in evidence and reasonable inferences drawn therefrom. *People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010). We acknowledge that the prosecutor may also employ rhetorical devices and engage in embellishment without misstating the evidence or the law. *Samson*, ¶¶ 31-32.

¶ 69    In the second step, we identify any misconduct and determine whether it warrants reversal under the applicable standard. *Wend*,

235 P.3d at 1096. When a defendant does not object at trial, we review prosecutorial misconduct for plain error. *People v. Vialpando*, 2022 CO 28, ¶ 20; *People v. Vasquez*, 2022 COA 100, ¶ 50 (citing *People v. Robinson*, 2019 CO 102, ¶ 19). Under the plain error standard, "we will only reverse when the misconduct was 'flagrantly, glaringly, or tremendously improper.'" *Robinson*, ¶ 19 (quoting *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005)).

### 3. Analysis

¶ 70 Under step one, we begin by reviewing the context of and the totality of the circumstances around the prosecutor's comment that McAllister's testimony "corroborated" K.A.'s and M.J.'s accounts. Her comments were near the beginning of her closing statement after saying that and K.A.'s and M.J.'s testimonies corroborated one another. The prosecutor said, "These are corroborated stories. These stories are corroborated by other people that were in the house. They're corroborated by Jean McAllister. We're gonna talk a lot about what Jean McAllister told you and educate everybody on — that was a lot of education." The prosecutor went on to say, "And you heard corroboration through other people. In the

prosecution's world, statements are corroborated, and in the prosecution's world, you now have information from Jean McAllister."  She went on to say that McAllister had never met with K.A., M.J., or Jeannoutot, and she had limited factual knowledge about the case.  The prosecutor told the jury that McAllister told them "exactly what was going to happen in this case and . . . she's never met anybody in this case."

¶ 71    We conclude the prosecutor's use of "corroborate" is within the context of her providing an educational framework with which the jury could view and weigh the victims' testimony.  Moreover, the plain language of the term "corroborate" supports our conclusion.  It means to strengthen or confirm or to make more certain.  Black's Law Dictionary 436 (12th ed. 2024).  Similarly, "corroborated" means (of a statement or claim) supported by independent evidence that is both credible and admissible.  *Id.*  The prosecutor properly used corroborate as a rhetorical device to imply that McAllister's testimony strengthened both victims' testimonies.  She did not misstate the evidence, claim that McAllister testified that K.A. and M.J. were truthful, or otherwise commit misconduct under step one of our analysis.  *Samson,* ¶¶ 31-32.

¶ 72    As for the second comment — that victim false allegations were "super rare" — it occurred during the prosecution's rebuttal argument.  The prosecutor characterized sexual abuse fabrications as "super rare" where McAllister had only said such fabrications are "rare."

¶ 73    We do not perceive a mischaracterization of evidence by the prosecutor adding the superlative adverb "super" to McAllister's testimony.  Prosecutors may embellish in their rhetoric during closing statements and adding a superlative to McAllister's testimony is not a mischaracterization of the evidence.

¶ 74    Regardless, under a plain error standard, neither comment, even if it was considered misconduct, rose to the level of being flagrantly, glaringly, or tremendously improper such that it substantially influenced the verdict or affected the fairness of the trial proceedings under plain error review.

## F.    Cumulative Error

¶ 75    Finally, Jeannoutot contends that the district court's combined errors amounted to cumulative error because, in the aggregate, he was unconstitutionally denied a fair trial.  *See Howard-Walker v. People*, 2019 CO 69, ¶¶ 23-24.  Because we have

concluded that there was only one error, there is no cumulative error. *See id.* at ¶ 25.

## III. Disposition

¶ 76 The district court's judgment is affirmed.

JUDGE KUHN and JUDGE MOULTRIE concur.